STATE OF CONNECTICUT *v.* ELLEN M. BURNS
(AC 32383)

Beach, Alvord and Espinosa, Js.

Argued May 31, 2012—officially released January 22, 2013

*Jeffrey C. Kestenband*, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Anthony Spinella*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ESPINOSA, J. The defendant, Ellen M. Burns, appeals from the judgment of conviction, rendered following a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor or any drug or both in violation of General Statutes § 14-227a (a) (1). The

defendant claims that the trial court improperly (1) denied her motion to suppress evidence the police obtained during their allegedly unlawful stop of her automobile, (2) denied her motion to suppress her statement refusing to take a Breathalyzer test and (3) overruled her objection to the state's comments, during closing argument, regarding the absence of corroborating witnesses for the defendant. The defendant also claims that the state engaged in prosecutorial impropriety by making such comments regarding missing witnesses without first notifying her or the court of its intent to do so, without obtaining the court's permission to do so and without establishing that the witnesses were available to testify. Last, the defendant claims that she should have been sentenced as a second offender, rather than as a third offender, under § 14-227a (g).[1] We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. On April 6, 2008, a witness in a vehicle behind the defendant's automobile observed the defendant's automobile sit through a green traffic signal, despite the witness' sounding of his vehicle's horn. The witness also observed the defendant drive erratically and hit a number of curbs as the witness, in his vehicle, followed the defendant and reported his location to the police. Later, Jason Wagner, a Manchester police officer, received a police dispatch about a possible drunken driver in the parking lot of the Roy Rogers restaurant in Manchester. En route to the Roy Rogers, Wagner saw the defendant's automobile traveling in the opposite direction, which matched the description provided by the dispatcher. Wagner turned around, again matched

---

[1] The court imposed a sentence of three years imprisonment, execution suspended after twenty-four months, three years of probation and a $2000 fine. As a condition of the probation, the court ordered the defendant not to operate a motor vehicle unless her privilege to do so is restored.

the marker plate of the defendant's automobile to the one provided by the dispatcher and then stopped the defendant on Scott Drive. Wagner observed beer cans in the defendant's automobile.

Subsequently, Jamie Taylor, a police officer with the Manchester police department, and another officer in training arrived at the location where the defendant was stopped. A portion of the defendant's car was pulled onto the curb. Taylor found that some of the beer cans in the defendant's car were open and that others were still cold. During Taylor's initial interaction with the defendant, she appeared to be intoxicated because she had an odor of alcohol coming from her mouth, was swaying heavily and had red, glossy eyes. Taylor observed the defendant perform several field sobriety tests at the direction of the officer in training. The defendant failed to successfully perform any of the field sobriety tests. Based on the defendant's intoxicated appearance and her unsuccessful performance of the field sobriety tests, Taylor and the officer in training arrested the defendant.

The defendant was charged with operating a motor vehicle while under the influence of intoxicating liquor or any drug or both in violation of § 14-227a (a) (1). On March 15, 2010, the defendant filed two motions to suppress relevant to this appeal: (1) a motion to suppress evidence obtained from the motor vehicle stop[2] and (2) a motion to suppress her statement refusing to take a Breathalyzer test. On March 19, 2010, the court held an evidentiary hearing related to these motions. In a memorandum of decision issued on March 22, 2010, the court denied the defendant's motions to suppress.

---

[2] In the motion underlying this appeal, the defendant moved to suppress all evidence from the stop of her automobile, including beer cans found in the automobile, because she claimed that the police lacked a reasonable and articulable suspicion to stop her in the first place.

On March 25, 2010, the defendant was found guilty by a jury of violating § 14-227a (a) (1).

Later, on the same day, the defendant was tried by the court on a part B information alleging that she had two prior convictions under § 14-227a (a). The court found the defendant guilty and, thus, imposed the enhanced penalties required under § 14-227a (g) as a result of the two prior convictions.[3] The defendant was sentenced on May 20, 2010. The defendant filed the present appeal on June 22, 2010. Additional facts will be set forth as necessary.

## I

### MOTION TO SUPPRESS EVIDENCE FROM THE MOTOR VEHICLE STOP

First, the defendant claims that the court improperly denied her motion to suppress evidence obtained from the police stop of her automobile, in violation of her fourth and fourteenth amendment rights, because the police officer conducting the stop lacked sufficient information to establish a reasonable and articulable suspicion of criminal activity. Specifically, the defendant claims that the anonymous tips leading to the stop were insufficient to create a reasonable and articulable suspicion because there was no confirmation of the identity or reliability of the citizen informants and no corroboration of the information provided by them. We disagree.

The following facts found by the trial court are relevant to this claim. On April 6, 2008, Wagner heard a police dispatch that a customer at the drive-through window of the Roy Rogers restaurant in Manchester appeared to be intoxicated. The dispatcher stated that the report was based on a call from an employee of the

---

[3] The defendant elected a court trial for the subsequent offender charge brought by the state in a part B information.

Roy Rogers who worked at the drive-through window of the restaurant. The dispatcher noted that this was the third report of the day regarding the same motor vehicle operator. The dispatcher provided the make, model and marker plate number of the automobile as reported by the Roy Rogers employee. Two minutes later, Wagner saw the automobile, turned his vehicle around and followed the automobile. Thereafter, Wagner conducted a stop of the defendant's automobile. Wagner saw, in plain view, beer cans on the back floor of the automobile, some of which were empty. All of the beer cans were seized.

. Taylor and an officer in training also arrived at the location on Scott Drive in Manchester where the defendant was pulled over and observed that the defendant's automobile was "up on the curb . . . ." The officer in training administered field sobriety tests to the defendant and subsequently arrested her.

In its memorandum of decision, the court found that the Roy Rogers "employee could have been easily identified and held accountable for a false report." The court concluded that "the police were justified in relying on the report as true and had a reasonable and articulable suspicion to stop the vehicle." The court concluded that "[t]he police did not violate the defendant's fourth amendment rights by seizing the beer cans in plain view."

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the

court's memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Cyrus*, 297 Conn. 829, 838, 1 A.3d 59 (2010).

"On appeal, [t]he determination of whether reasonable and articulable suspicion exists rests on a two part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct." (Internal quotation marks omitted.) Id., 837–38.

"An investigating officer may briefly stop a motorist if the officer has a reasonable and articulable suspicion that criminal activity may be afoot . . . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . Whether a reasonable and articulable suspicion exists depends on the totality of the circumstances. . . .

"In cases in which a police stop is based on an informant's tip, corroboration and reliability are important factors in the totality of the circumstances analysis." (Citations omitted; internal quotation marks omitted.) *State* v. *Torelli*, 103 Conn. App. 646, 652–53, 931 A.2d 337 (2007). "When law enforcement officials corroborate the details of an anonymous informant's tip, the tip can give rise to a reasonable articulable suspicion." *State* v. *Anderson*, 24 Conn. App. 438, 443, 589 A.2d 372, cert. denied, 219 Conn. 903, 593 A.2d 130 (1991).

In *Anderson*, this court held that the police had a reasonable and articulable suspicion to stop a defendant's automobile based on the information provided by an anonymous caller that the automobile driver's operator's license was under suspension. Id., 439–40, 443. The caller provided specific information regarding

the make, markings and color of the automobile, the location where it was operated and the number of occupants in the automobile. Id., 445. The responding police officer made independent observations confirming that the details of the tip were accurate and current. Id., 443. "The officer's ability to make an empirical confirmation that the details of the anonymous tip were accurate provided a reasonable basis for the suspicion that the truck was being driven by an operator without a license." Id.

In *State* v. *Torelli*, supra, 103 Conn. App. 657, this court held that a police officer had a reasonable and articulable suspicion to stop a defendant's automobile after a police dispatcher provided the officer with a sufficiently reliable report from a citizen informant of a possible drunken driver. Through the dispatcher, the citizen conveyed to the responding officer the make, model, color and location of the defendant's automobile. Id., 649. The court found that "the information that [the responding police officer] obtained from the dispatcher was sufficiently corroborated to provide a reliable basis for stopping the defendant. Although information about the make, model and color of the defendant's car was in itself innocuous, the car's location corroborated the informant's report." Id., 656.

Moreover, in *Torelli*, this court rejected the defendant's claim that the police officer lacked sufficient information to corroborate the allegation of drunken driving when the officer himself did not observe any erratic driving by the defendant. Id., 657. This court reasoned: "Because of the state's pervasive interest in preventing drunken driving, the officer was not required to wait for erratic driving or an accident to occur before pulling over the defendant." Id.; see also *State* v. *Bolanos*, 58 Conn. App. 365, 370, 753 A.2d 943 (2000) (concluding there was sufficient corroboration to establish reasonable and articulable suspicion when police

observations corroborated report of make, model, color and direction of defendant's car).

In this case, the defendant claims that the information provided by the person who placed the third call, a citizen claiming to be an employee of the Roy Rogers restaurant, was unreliable because there was no confirmation of the employee's identity and the location of the call was not confirmed.[4] The defendant also claims that the information provided by the anonymous tips was not corroborated before Wagner stopped the defendant. In particular, the defendant emphasizes the fact

---

[4] In its memorandum of decision, the court found that the "employee could have been easily identified and held accountable for a false report" and that "the police were justified in relying on the report as true . . . ." The defendant argues, however, that there is no evidence in the record to support the court's implicit finding that the caller was actually an employee of Roy Rogers and was calling from the restaurant when he or she made the report. Our review of the record does not reveal any evidence that the police verified sufficient information from the person who placed the third call to render him or her identifiable. Accordingly, we analyze the defendant's claim as if the third report came from an anonymous source.

The defendant also claims that the information from the person who placed the third call was unreliable because the police could not verify the caller's basis for concluding that the defendant was intoxicated or the caller's ability to recognize such signs. The fact that the police did not determine the caller's basis for concluding that the defendant was intoxicated or verify the caller's ability to recognize such signs before Wagner stopped the defendant does not weaken the police reliance on that information because a layperson is presumptively competent to assess intoxication. See *State* v. *Bolanos*, supra, 58 Conn. App. 369 ("laymen may testify as to their opinion of whether a person is intoxicated" [internal quotation marks omitted]).

In addition, the defendant mentions in one sentence in her brief that the information that the police received was less reliable because it reached Wagner through two levels of hearsay. We are not persuaded by this argument because we look at all of the information known to the police before the stop of the defendant's automobile. See *State* v. *Richards*, 113 Conn. App. 823, 835, 968 A.2d 920 (2009) ("To the extent that the defendant invites us to compartmentalize the facts known by the police . . . we decline such a method of review. In determining whether the police had a reasonable and articulable suspicion of criminal activity, we look at all of the information known by the police prior to the investigative detention. Whether a reasonable and articulable suspicion exists depends on the totality of the circumstances." [Internal quotation marks omitted.]), appeal dismissed, 299 Conn. 238, 9 A.3d 707 (2010).

that Wagner did not observe any erratic operation of the defendant's automobile before stopping her as an indication that the information was not corroborated.

Based on the totality of the circumstances in this case, we agree with the court's conclusion that the evidence in the record demonstrates that the police had a reasonable and articulable suspicion to stop the defendant's automobile. Much like the circumstances in *Anderson, Torelli* and *Bolanos*, the information provided by the callers to the police dispatcher was sufficiently corroborated by independent observations of the responding police officer to form a reasonable and articulable suspicion. See *State* v. *Anderson,* supra, 24 Conn. App. 443; see also *State* v. *Torelli,* supra, 103 Conn. App. 656; *State* v. *Bolanos,* supra, 58 Conn. App. 369–70. The dispatcher announced that an employee of the Roy Rogers restaurant reported that a driver at the restaurant's drive-through window appeared to be under the influence. Based on the employee's report, the dispatcher provided the make, model and marker plate of the automobile. Within approximately two minutes of the report, Wagner saw the automobile traveling in the opposite direction in the area near Roy Rogers, turned his vehicle around, followed the automobile and pulled it over.

Even if we assume that the information was provided by a citizen informant who was completely anonymous to the police, Wagner's own observations as to the make, model, marker plate and location of the defendant's automobile corroborated the citizens' reports.[5]

---

[5] The defendant also argues that *State* v. *Cyrus,* 111 Conn. App. 482, 959 A.2d 1054 (2008), aff'd, 297 Conn. 829, 1 A.3d 59 (2010), compels the conclusion that the stop of her automobile was not based on sufficiently reliable information. The defendant's reliance on *Cyrus* is misplaced because, contrary to the defendant's assertion, in that case, this court did not hold that "[a]n anonymous tip of erratic operation that identifies the make and license plate number of the car, but is not corroborated by any other information, is not sufficiently reliable to permit a motor vehicle stop." Instead, this court did not consider this finding of the trial court because it was not

In other words, the police were able to independently and empirically confirm that the details of the tip were accurate before pulling over the defendant. See *State v. Anderson*, supra, 24 Conn. App. 443. The details were sufficiently specific and predictive of the defendant's future behavior such that Wagner was able to locate the defendant's automobile within about two minutes after receiving the dispatch. "Although information about the make [and] model . . . of the defendant's car was in itself innocuous, the car's location corroborated the informant's report." *State v. Torelli*, supra, 103 Conn. App. 656. Further, the police knew that this was the third report of the day, regarding the same possibly intoxicated automobile operator, which served to bolster the reliability of the information. Moreover, as we noted in *Torelli* and *Bolanos*, "[b]ecause of the state's pervasive interest in preventing drunken driving, the officer was not required to wait for erratic driving or an accident to occur before pulling over the defendant." Id., 657. Based on the totality of the circumstances, the evidentiary record supports the court's legal conclusion that the police had a reasonable and articulable suspicion to stop the defendant's vehicle. Therefore, the court properly denied the defendant's motion to suppress the evidence obtained from the stop of her automobile.

## II

### MOTION TO SUPPRESS THE DEFENDANT'S REFUSAL STATEMENT

Next, the defendant claims that the court improperly denied her motion to suppress her statement refusing to take a Breathalyzer test because the statement was made in response to a custodial police interrogation

challenged on appeal. See *State v. Cyrus*, supra, 485 ("[o]n appeal, the state does not contest the validity of this finding by the court").

after she was read and after she invoked her *Miranda*[6] rights. Specifically, the defendant claims that her fifth and fourteenth amendment rights were violated because she was (1) coerced into giving an involuntary statement after she invoked her right to remain silent and (2) subjected to interrogation after she invoked her right to counsel. We disagree.

The following facts found by the court are relevant to this claim. The defendant was arrested and placed in handcuffs shortly after 4:18 p.m. on April 6, 2008. At police headquarters, the officer in training present during the defendant's arrest advised the defendant of her *Miranda* rights. The defendant signed the notice of rights form at approximately 5:15 p.m. Taylor gave the defendant the right to read the officer's OUI arrest and alcohol refusal or failure report (form A-44)[7] and gave the defendant the opportunity to contact counsel. The defendant attempted to call an attorney, but was unable to reach him. "Fifteen to twenty minutes later, Officer Taylor told [the] defendant [that] time was running out and that she had to make a decision to take the [Breathalyzer] test or not to take it. The defendant refused to take the test. Officer Taylor gave [the] defendant a copy of her refusal."

---

[6] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[7] "The A-44 form is used by the police to report an arrest related to operating a motor vehicle under the influence and the results of any sobriety tests administered or the refusal to submit to such tests." (Internal quotation marks omitted.) *State* v. *Bereis*, 117 Conn. App. 360, 368 n.7, 978 A.2d 1122 (2009). In this case, the court noted that the "form includes sections on operator and vehicle information, investigation information, field sobriety test results, postarrest interview, the implied consent advisory and the chemical alcohol test refusal." The implied consent advisory contains a notice that the fact of a refusal may be admissible in evidence against the arrested individual in a criminal prosecution for driving under the influence of alcohol or drugs, or other offense, and that evidence of a refusal may be used against the individual in a criminal prosecution.

In its memorandum of decision, the court found that the defendant's claim that "her will was overborne by the [officer's] demand that she make a choice about taking the test" was without merit. Further, the court stated: "There was no interrogation. The refusal was not an incriminating statement in the form of a confession. Connecticut General Statutes § 14-227b (b)[8] is presumptively constitutional and permits the police to request a defendant arrested for operating under the influence to submit to a blood or urine test." Accordingly, the court denied the motion to suppress the evidence of the defendant's refusal.

## A

We first address the defendant's claim that she was coerced into giving an involuntary statement after she invoked her right to remain silent. As noted previously, in reviewing a trial court's findings and conclusions in

---

[8] General Statutes § 14-227b (b) provides in relevant part: "If any such person, having been placed under arrest for operating a motor vehicle while under the influence of intoxicating liquor or any drug or both, and thereafter, after being apprised of such person's constitutional rights, having been requested to submit to a blood, breath or urine test at the option of the police officer, having been afforded a reasonable opportunity to telephone an attorney prior to the performance of such test and having been informed that such person's license or nonresident operating privilege may be suspended in accordance with the provisions of this section if such person refuses to submit to such test . . . and that evidence of any such refusal shall be admissible in accordance with subsection (e) of section 14-227a and may be used against such person in any criminal prosecution, refuses to submit to the designated test, the test shall not be given; provided, if the person refuses or is unable to submit to a blood test, the police officer shall designate the breath or urine test as the test to be taken. The police officer shall make a notation upon the records of the police department that such officer informed the person that such person's license or nonresident operating privilege may be suspended if such person refused to submit to such test . . . ."

General Statutes § 14-227a (e) provides in relevant part: "In any criminal prosecution for a violation of subsection (a) of this section, evidence that the defendant refused to submit to a blood, breath or urine test requested in accordance with section 14-227b shall be admissible provided all requirements of subsection (b) of said section have been satisfied. . . ."

connection with a motion to suppress, "[w]here the legal conclusions of the court are challenged, [our review is plenary and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . .

"[T]he ultimate determination . . . of whether a defendant already in custody has been subjected to interrogation . . . presents a mixed question of law and fact over which [this court's] review is plenary, tempered by [a] scrupulous examination of the record to ascertain whether the findings are supported by substantial evidence. . . .

"It is well established that the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self incrimination. . . . Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . .

"A defendant in custody is subject to interrogation not only in the face of express questioning by police but also when subjected to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . Whether a defendant in custody is subject to interrogation necessarily involves determining first, the factual circumstances of the police conduct in question, and second, whether such conduct is normally attendant to arrest and custody or whether the police should know that such conduct is reasonably likely to elicit an incriminating response.

. . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (Citations omitted; internal quotation marks omitted.) *State* v. *Silver*, 126 Conn. App. 522, 529–30, 12 A.3d 1014, cert. denied, 300 Conn. 931, 17 A.3d 68 (2011).

In *South Dakota* v. *Neville*, 459 U.S. 553, 554, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983), the United States Supreme Court squarely addressed the issue presented by this claim. In that case, the defendant was arrested on suspicion of driving while intoxicated and read his *Miranda* rights. Id., 555. Several times, the defendant refused to take the test. Id., 555–56. Despite the existence of a South Dakota statute[9] specifically permitting the admission of an individual's refusal to submit to a blood alcohol test into evidence at trial, the defendant successfully moved to suppress all evidence of his refusals. Id., 556.

In reversing the South Dakota Supreme Court's affirmance of the suppression of the defendant's refusal, the United States Supreme Court held "that a refusal to take a blood-alcohol test, after a police officer has lawfully requested it, is not an act coerced by the

---

[9] In 1980, at the time of the crime in *Neville*, § 32-23-10.1 of the South Dakota Codified Laws was substantially similar to the relevant statute in this case, § 14-227a (e). Section 32-23-10.1 stated in relevant part: "If a person refuses to submit to chemical analysis of his blood, urine, breath or other bodily substance, as provided in § 32-23-10, and that person subsequently stands trial for driving while under the influence of alcohol or drugs . . . *such refusal may be admissible into evidence at the trial.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Neville*, 312 N.W.2d 723, 724 (S.D. 1981), rev'd on other grounds, 459 U.S. 553, 103 S. Ct. 916, 74 L. Ed. 2d 748 (1983).

officer, and thus is not protected by the privilege against self-incrimination." Id., 564. The court found that "the State did not directly compel [the defendant] to refuse the test, for it gave him the choice of submitting to the test or refusing." Id., 562. "In the context of an arrest for driving while intoxicated, a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of *Miranda*." Id., 564 n.15; see also *Wainwright* v. *Greenfield*, 474 U.S. 284, 293, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986) ("[U]nlike the refusal to take an optional blood-alcohol test, the right of silence after *Miranda* warnings is of constitutional dimension. . . . [U]nlike the state warning about the refusal to take the blood-alcohol test [which expressly advised (the defendant) that his refusal could be used to deprive him of his driving privileges], *Miranda* warnings contain implied assurances that silence will *not* be used against the suspect." [Citation omitted; emphasis in original.]).

In this case, based on the evidence before it, the court properly concluded that the defendant's refusal to take the Breathalyzer test was not in response to police interrogation. Preliminarily, we disagree with the defendant's characterization of Taylor's statement to the defendant that "time was running out and that she had to make a decision to take the [Breathalyzer] test or not to take it" as a command that effectively deprived her of the option to remain silent and rendered her refusal involuntary. As in *South Dakota* v. *Neville*, supra, 459 U.S. 562, the police officer in this case did not compel the defendant to refuse the test because he gave her the *choice* of submitting to the test or refusing, as he was explicitly authorized to do under § 14-227b (b). The fact that Taylor presented the choice to the defendant in the form of an affirmative statement did not change the fact that he was inquiring as to whether the defendant would take the Breathalyzer test. "[A] police

inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of *Miranda.*" Id., 564 n.15. Further, "a refusal to take a blood-alcohol test, after a police officer has lawfully requested it, is not an act coerced by the officer, and thus is not protected by the privilege against self-incrimination." Id., 564.

Like the statute at issue in *Neville,* § 14-227b (b) expressly authorizes a police officer to request a motor vehicle operator placed under arrest for operating a motor vehicle while under the influence of intoxicating liquor or any drug or both to submit to a Breathalyzer test. Under § 14-227a (e), a defendant's refusal to take such a Breathalyzer test is admissible into evidence provided the defendant is apprised of her constitutional rights, is afforded a reasonable opportunity to telephone an attorney prior to the performance of such test, is informed that her license or nonresident operating privilege may be suspended if such person refuses to submit to the test and that evidence of any such refusal shall be admissible. See General Statutes § 14-227a (e).

Here, Taylor gave the defendant the choice of taking a Breathalyzer test or refusing after she was read her *Miranda* rights, was given the opportunity to contact counsel, signed the notice of rights form and was given the right to read the form A-44, which contained information regarding the postarrest interview, the implied consent advisory and the chemical alcohol test refusal. Taylor's statement to the defendant, one expressly authorized by § 14-227b (b), was part of conduct normally attendant to arrest and custody, and not one that he should have known was reasonably likely to elicit an incriminating response from the suspect.[10] Accordingly,

_____

[10] The defendant argues that in *State* v. *Bereis,* 117 Conn. App. 360, 375, 978 A.2d 1122 (2009), this court held that "it is improper to admit evidence that a defendant charged with [driving under the influence] refused to answer questions *and take a breath test* after being Mirandized." (Emphasis added.) The defendant misinterprets our holding in *Bereis* because, contrary to

the court properly found, based on the evidence in the record, that there was no police interrogation of the defendant. Therefore, the defendant's right to remain silent was not violated when Taylor gave her the choice to take or to refuse the Breathalyzer test. As such, the court properly denied the defendant's motion to suppress her statement.

## B

The defendant also seeks review, under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), of the second part of her claim, which is that the admission of her refusal statement was improper because she was subjected to a custodial interrogation after she invoked her right to counsel. Under *State* v. *Golding*, supra, 239-40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.)

---

her assertion, the defendant in that case specifically did not challenge the admission of her refusal to take the intoximeter breath test. *State* v. *Bereis*, supra, 377 n.13. Instead, we found a violation of the defendant's fifth amendment right to remain silent, as defined in *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), only as a result of the court's admission of evidence that the defendant refused to answer a series of specific questions regarding her intake of medication, food, drugs or alcohol contained in the A-44 alcohol test report. *State* v. *Bereis*, supra, 377. Moreover, we specifically cited to § 14-227b (b), the statute authorizing a police officer to request a breath test, after noting that the defendant did not challenge the admission of evidence of her refusal to take the intoximeter test. Id., 377 n.13.

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police *interrogation*." (Emphasis added; internal quotation marks omitted.) *State* v. *Silver*, supra, 126 Conn. App. 529. "If a suspect indicates that he wishes to remain silent, 'the interrogation must cease' and if he requests counsel, 'the *interrogation* must cease until an attorney is present.'" (Emphasis added.) *State* v. *Evans*, 203 Conn. 212, 224, 523 A.2d 1306 (1987), quoting *Miranda* v. *Arizona*, 384 U.S. 436, 474, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); see *Edwards* v. *Arizona*, 451 U.S. 477, 482, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

Even if we assume, without deciding, that the defendant invoked her right to counsel in this case, she cannot establish that a violation of her fifth amendment right not to be interrogated after invoking the right to counsel clearly exists because, as discussed previously, the court properly concluded that no police interrogation occurred. The defendant, therefore, cannot satisfy the third prong of *Golding*. Accordingly, we reject this part of the defendant's second claim.

## III

## CLOSING ARGUMENT

Next, the defendant claims that the court abused its discretion by overruling her objection to the prosecutor's comments, during the state's closing argument and rebuttal, regarding the absence of corroborating witnesses for the defendant. The defendant also claims that the state engaged in prosecutorial impropriety in violation of her fifth and fourteenth amendment rights to a fair trial by commenting on the absence of corroborating witnesses without first notifying her or the court of its intent to do so, without obtaining the court's permission to do so, and without establishing that the

witnesses were available to testify. We conclude that, although the court abused its discretion by overruling the defendant's objection to the state's missing witness argument, the court's action did not constitute harmful error. Likewise, although the state's missing witness argument without prior notice or proof of availability constituted impropriety, the prosecutor's impropriety did not deprive the defendant of receiving a fair trial.

In order to provide context for the defendant's third claim, we briefly summarize the relevant parts of the defendant's testimony at trial. The defendant testified that during the morning of April 6, 2008, she attended a church service with her parents and children. After the service, the defendant sat and talked with a friend from church. The defendant then went home, changed her clothing for a dance class and traveled to the class in her son's car. The defendant testified that the beer found in the car belonged to her son. When asked whether she had any physical conditions that could have affected her ability to perform the one leg stand test, one of the sobriety tests the police asked her to perform, the defendant testified that she has a torn meniscus in her right knee, has bad ankles and previously broke her left kneecap. When asked about conditions that would affect her ability to perform the walk turn test, another of the sobriety tests the police asked her to perform, the defendant testified that she has femoral retroversion, a condition causing her legs to turn out.

The following undisputed facts are relevant to both parts of this claim. During the state's closing argument, the prosecutor argued: "[The defendant's] testimony has absolutely none, zero, corroboration. You never heard from a doctor; you never heard from her son taking responsibility for those beer cans; you never heard from the friend allegedly in the parking lot after church. Everything you heard was from her mouth, and

she is the only one who has something at stake in this trial. So, I'd ask you to keep those things in mind, and I'll get back to you after the defense is done."

During the state's rebuttal to the defendant's closing argument, the following dialogue took place:

"[The Prosecutor]: . . . And again, back to the defendant's testimony, did she have any corroboration for any of the statements she made?

"[Defense Counsel]: Your Honor, I'm going to object to that. I didn't object before, but we had no burden of proof.

"The Court: Burden of proof and corroboration, counsel, are not the same. You may continue, [prosecutor].

"[The Prosecutor]: Did you ever hear from her son, who she hung out to dry about the beer cans? Did he ever come in here and testify? Did you hear from any doctors come in and testify about her medical condition? Did you hear about this guy, who apparently she spent some time with after mass? Did you hear from her parents indicating that she actually went to mass?"

At the conclusion of closing arguments, after the jury was excused, the defendant's attorney reiterated his objection to the state's comments about the absence of witnesses called by the defendant. The defendant's attorney stated: "I stand by the objection I made to the comment about not calling certain witnesses, including [the defendant's] son, the friend from church, and the doctors.

"In addition to the fact that we have no burden of proof, I would also argue that that argument violates the doctrine of [*State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000)] as to arguing inferences to be drawn from the absence of certain

witnesses. *Malave* requires that the party who intends to argue that way provide notice to the court and that certain inferences may be argued with the court's permission, but that simply didn't happen here. No notice was provided on that issue."

In response, the court stated: "[O]ur appellate courts have recognized that some latitude must be afforded for counsel during closing arguments and that latitude does not extend beyond what could be considered fair comment and legitimate argument. Now, concerning counsel's last two objections . . . the court sees those comments . . . as fair comment and legitimate argument. So, the court will not provide any curative instruction to the jury concerning those comments.

"The comment by counsel that you essentially heard [the defendant's] testimony with no corroboration, this court feels falls short of the burden shifting that defense counsel has asserted. It will be clear from the instructions that the state bears the burden of proof. Corroboration, that is, naked testimony of the defendant without corroboration does not appear in the context of the comments by the state to dilute the state's burden of proof or to place the burden [on] the defense. The defense decided to present evidence. And the indication that there was no corroboration also appears to this court to fall within the ambit of fair comment and legitimate argument."

## A

We first assess whether the court abused its discretion in overruling the defendant's objection to the state's missing witness argument.[11] "We review the court's

[11] Because the defendant did not object to the state's references to missing witnesses during the state's initial closing argument, the state argues that "to the extent that the defendant's claim is based on the comments by the state in its initial closing argument, that aspect of her claim of error should not be reviewed, not only because it is an unpreserved, nonconstitutional claim, but also because it should be deemed waived." We interpret the defendant's objection during the state's rebuttal and after the jury was

decision allowing the state to include a missing witness argument in its closing argument for abuse of discretion. . . . It is within the discretion of the trial court to limit the scope of final argument . . . . The broad discretion vested in trial courts by [*State* v. *Malave*, supra, 250 Conn. 722], mirrors the general standards regarding the trial court's ability to limit closing argument. [T]he scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . We first determine whether the trial court abused its discretion in light of the information before the court when it ruled on the motion. If there was such an abuse of discretion, the reviewing court must determine whether the defendant has established that, in light of the totality of evidence at trial and the trial court's subsequent instructions to the jury, the impropriety constituted harmful error." (Citations omitted; internal quotation marks omitted.) *State* v. *Jordan*, 118 Conn. App. 628, 638–39, 984 A.2d 1160 (2009), rev'd on other grounds, 305 Conn. 1, 44 A.3d 794 (2012).

"Either party in a criminal case may make appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case." (Internal quotation marks omitted.) Id., 639. "So long as counsel does not directly exhort the jury to draw an adverse inference by virtue of the witness' absence, the argument does not fall within the *Secondino*[12] rule, and [the holding of *Malave*] does not

excused as a reference to the state's initial closing argument and its rebuttal. As such, the defendant's claim objecting to the state's missing witness arguments in its closing argument and rebuttal was adequately preserved at trial and is now properly before this court on review.

[12] *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960), overruled in part by *State* v. *Malave*, 250 Conn. 722, 738–39, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000).

forbid it." *State* v. *Malave*, supra, 250 Conn. 739. "As justification for its request, counsel must demonstrate that such witness was available to testify, set forth the substance of the testimony that such witness would have given had he been called to the witness stand and explain how his testimony would have been detrimental to the [opposing party's] case. Evidence that would have been merely cumulative or of no consequence to a reasonable assessment of the [opposing party's] case, for example, would not warrant such an argument. . . . After hearing the party's justification, the court retains broad discretion to allow or to preclude either party from making such a comment in its closing statement." (Citation omitted; internal quotation marks omitted.) *State* v. *Jordan*, supra, 118 Conn. App. 639–40.

"When proving availability, counsel seeking to make the missing witness argument must first offer evidence to support the witness' availability and the court must make a finding that the witness was actually available to testify." Id., 640. "[A] party cannot merely comment on the failure of the opposing party to present a witness without first providing a factual or evidentiary foundation from which to infer a weakness in the opposing party's case." (Internal quotation marks omitted.) *State* v. *Mungroo*, 104 Conn. App. 668, 678, 935 A.2d 229 (2007), cert. denied, 285 Conn. 908, 942 A.2d 415 (2008).

In the present case, the state concedes that it failed to obtain the court's permission to comment on the absence of witnesses for the defense before doing so, as required by *State* v. *Malave*, supra, 250 Conn. 740. The record demonstrates that the state also failed to provide any evidence that demonstrated that the witnesses to whom the prosecutor referred were available to testify.[13] Further, the state did not set forth the substance of the testimony that such witnesses would have

---

[13] The state argues that this portion of the defendant's claim should not be reviewed because the defendant did not object to the state's argument on this ground at trial. The state claims that its failure to provide notice

given had they been called or explain how the witnesses' testimony would have been detrimental to the defendant's case. See *State* v. *Jordan*, supra, 118 Conn. App. 639–40.

The state's failure to provide prior notice of its missing witness argument to the court or the defendant and the state's failure to provide evidence regarding the witnesses' availability, the substance of their testimony or how their testimony would have been detrimental to the defendant's case was improper because "[f]airness . . . dictates that a party who intends to comment on the opposing party's failure to call a certain witness must so notify the court and the opposing party in advance of closing arguments. . . . That notice will ensure that an opposing party is afforded a fair opportunity to challenge the propriety of the missing witness comment in light of the particular circumstances and factual record of the case." *State* v. *Malave*, supra, 250 Conn. 740.

In response to the defendant's objections, the court did not inquire about the state's ability to offer evidence as to the availability of the witnesses, nor did it address the lack of notice to the defendant or the court. Instead, the court found that the challenged statements "[fell] within the ambit of fair comment and legitimate argument." Because the court did not take remedial measures to address the state's failure to provide the court or the defendant with prior notice of its missing witness argument or the state's failure to provide evidence regarding the witnesses' availability, the substance of their testimony or how their testimony would have been

was the sole basis for the defendant's objection. The defendant argues that her objection was based on the entire *Malave* doctrine, which encompassed the state's failure to prove the availability of the missing witnesses to whom it referred. We agree with the defendant that her objection was sufficient to preserve her present claim in its entirety.

detrimental to the defendant's case, we conclude that the court abused its discretion.

We now must consider whether the abuse of discretion constituted harmful error. "The dispositive question in harmful error analysis is whether we have a fair assurance that the defendant received a fair trial. . . . This may be determined by considering whether the jury's verdict was substantially swayed by the error. . . . The thrust of the standard is to look to the effect of the error and to determine if it had little to no impact on the defendant's conviction." (Citations omitted; internal quotation marks omitted.) *State* v. *Jordan*, supra, 118 Conn. App. 641.

We conclude that the court's abuse of discretion did not constitute harmful error because the defendant has failed to demonstrate that the jury's verdict was substantially swayed by the court's error in allowing the missing witness arguments. Here, even though the state failed to take the requisite procedural steps before making a missing witness argument, the substance of the state's argument did not explicitly exhort the jury to draw an adverse inference by virtue of the witnesses' absence. Instead, the state referred generally to the absence of the witnesses—her son, parents, friend from church and a doctor—who were relevant to the defendant's testimony in order to implicitly expose the weaknesses of the defendant's case, as *Malave* expressly permits. See *State* v. *Malave*, supra, 250 Conn. 739.

The state specifically referred to these witnesses as support for its argument that the defendant's own testimony lacked corroboration, thereby drawing the jury's attention to the defendant's credibility, rather than asking it to draw an adverse inference from the witnesses' absence. Further, the state made no argument that the defendant purposefully did not call the witnesses because she preferred them to be absent, and it is no

more likely that the jury inferred that the witnesses would have contradicted the defendant's testimony as it is that the jury inferred that the witnesses would have supported the defendant's testimony.

Moreover, even if the state did not refer to the missing defense witnesses at issue, and the jury credited the relevant parts of the defendant's testimony to which these witnesses would have testified, the defendant's testimony was unlikely to contradict or undermine the state's strong evidence against her. A witness testified that he observed the defendant's automobile sit through a green traffic signal, despite the witness' sounding of his vehicle's horn, and then observed the defendant drive erratically and hit a number of curbs as the witness, in his vehicle, followed the defendant and reported his location to the police. Two responding police officers testified that they observed beer cans in the backseat of the defendant's automobile after she pulled over. Taylor testified that some of the cans were open and that others were still cold.

Taylor also provided the following testimony. When he arrived at the location where the defendant was pulled over, the defendant's automobile was positioned such that it was on the curb and sidewalk area. During Taylor's initial investigation of the defendant, she had an odor of alcohol coming from her mouth, was swaying heavily, had red, glossy eyes and appeared to be quite intoxicated. The defendant stumbled and swayed as she walked to the sidewalk. Several field sobriety tests were performed on the defendant. Taylor observed nystagmus at maximum deviation and lack of smooth pursuit in both of the defendant's eyes when another officer administered the horizontal gaze nystagmus test. In the walk turn test, the defendant did not walk heel to toe on any of her steps, did not walk in a straight line, lost her balance and did not perform the turn correctly. After the defendant attempted to perform the one leg

stand test, Taylor stopped the test because he thought the defendant might fall due to her level of intoxication. The defendant refused to take a Breathalyzer test after she was arrested.[14]

Regardless of any inference the jury may have drawn from the state's missing witness comments, the foregoing evidence was not significantly undermined by the defendant's testimony and provided a compelling case for conviction. In addition, the state's reference to missing witnesses was isolated to two nearly identical comments during its closing argument and rebuttal, such that they were infrequent in relation to the totality of the evidence and arguments presented at trial. In light of all of the evidence, we conclude that the jury's verdict was not substantially swayed by the admission of the state's isolated missing witness references, such that we have a fair assurance that the defendant received a fair trial. Therefore, the court's error was harmless.

B

We now turn to the defendant's claim that the state engaged in prosecutorial impropriety. "[A] claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under State v. Williams, 204 Conn. 523, 535–40, 529 A.2d 653 (1987)." (Internal quotation marks omitted.) State v. Burgos-Torres, 114 Conn. App. 112, 120, 968 A.2d 476, cert. denied, 293 Conn. 908, 978 A.2d 1111 (2009). Failure to provide notice to the court and opposing counsel of a missing witness argument before making such an argument, can constitute prosecutorial impropriety. See State v. DeCarlo, 92

---

[14] As permitted by § 14-227a (e), the court instructed the jury that it was allowed to draw an unfavorable permissive inference if it found unanimously, beyond a reasonable doubt, that the defendant refused to submit to the Breathalyzer test.

Conn. App. 565, 571, 887 A.2d 378 (2005) (holding prose-
cutorial impropriety occurred when prosecutor invited
jury to draw adverse inference from absence of defense
witness and did not provide prior notice of argument,
in violation of *Malave*); *State* v. *Orellana*, 89 Conn.
App. 71, 108–109, 872 A.2d 506 (holding prosecutor's
argument constituted impropriety when prosecutor
commented on defendant's failure to call his brother
as witness without providing notice to court and defen-
dant as required by *Malave*), cert. denied, 274 Conn.
910, 876 A.2d 1202 (2005).

"[T]he touchstone of due process analysis in cases
of alleged prosecutorial [impropriety] is the fairness of
the trial, and not the culpability of the prosecutor. . . .
In analyzing claims of prosecutorial [impropriety], we
engage in a two step analytical process. The two steps
are separate and distinct: (1) whether [impropriety]
occurred in the first instance; and (2) whether that
[impropriety] deprived a defendant of his due process
right to a fair trial. Put differently, [impropriety] is
[impropriety], regardless of its ultimate effect on the
fairness of the trial; whether that [impropriety] caused
or contributed to a due process violation is a separate
and distinct question that may only be resolved in the
context of the entire trial . . . . We also note that in
order to prove prosecutorial [impropriety], the defen-
dant must demonstrate substantial prejudice by estab-
lishing that the trial as a whole was fundamentally unfair
and that the [impropriety] so infected the trial with
unfairness as to make the conviction a denial of due
process." (Internal quotation marks omitted.) *State* v.
*Martinez*, 95 Conn. App. 162, 178–79, 896 A.2d 109, cert.
denied, 279 Conn. 902, 901 A.2d 1224 (2006).

"Once prosecutorial impropriety has been alleged
. . . it is unnecessary for a defendant to seek to prevail
under [*State* v. *Golding*, supra, 213 Conn. 239–40], and
it is unnecessary for an appellate court to review the

defendant's claim under *Golding*. . . . The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in [*State v. Williams*, supra, 204 Conn. 535–40]." (Internal quotation marks omitted.) *State* v. *Jordan*, 117 Conn. App. 160, 163, 978 A.2d 150, cert. denied, 294 Conn. 904, 982 A.2d 648 (2009). "These factors include: (1) the extent to which the [impropriety] was invited by defense conduct or argument; (2) the severity of the [impropriety]; (3) the frequency of the [impropriety]; (4) the centrality of the [impropriety] to the critical issues in the case; (5) the strength of the curative measures adopted; and (6) the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Martinez*, supra, 95 Conn. App. 182.

Before applying the *Williams* factors, we first must consider whether impropriety occurred in the first place. Relying on our analysis in part III A of this opinion, we conclude that the state engaged in impropriety because it violated the procedural requirements prescribed by *Malave* before making a missing witness argument. Because impropriety occurred, we apply the *Williams* factors to determine whether the impropriety deprived the defendant of her right to a fair trial.

Applying the *Williams* factors, we conclude that the state's impropriety did not deprive the defendant of her due process right to a fair trial. In this case, the impropriety was not invited by the defendant. The court also did not adopt any curative measures in response to the defendant's objection. Although the defendant's objection to the state's missing witness comments during the state's rebuttal allows the inference that defense counsel thought the remarks were severe, we, as the reviewing court, must make the ultimate determination

of the severity of the impropriety. See *State* v. *Santiago*, 269 Conn. 726, 759, 850 A.2d 199 (2004). As discussed previously, the state's missing witness references were made to expose specific weaknesses in the defendant's own testimony due to a lack of corroboration and did not directly exhort the jury to draw an adverse inference simply by virtue of the witnesses' absence. Likewise, the state did not make any argument that the defendant purposefully did not call the witnesses because she preferred them to be absent. Because the substance of the state's references to missing witnesses was permissible under *Malave*, we conclude that the impropriety was not particularly severe in this case, despite the state's failure to adhere to the necessary procedural prerequisites before making a missing witness argument.[15]

Finally, considered in the context of the entire trial, the infrequency of the impropriety and the strength of the state's case, even in the absence of the missing witness comments, militate against the conclusion that the state's comments deprived the defendant of her due process right to a fair trial. As explained in the analysis in part III A of this opinion, the impropriety was not frequent because it was isolated to two nearly identical comments during the state's closing argument and rebuttal. See *State* v. *Orellana*, supra, 89 Conn. App. 109 (finding prosecutor's impropriety to be infrequent under *Williams* analysis when confined to two comments in argument). Further, as we discussed in part

---

[15] The defendant argues that the state's comments were central to the critical issue of the case, which was whether she was operating under the influence, and, thus, supports the conclusion that the impropriety deprived her of a fair trial. Even if we assume that the prosecutor's comments on the lack of testimony corroborating the defendant's case related to this critical issue, as discussed previously, the substance of the comments would have been permissible under *Malave* had the state taken the proper procedural steps before the prosecutor referred to a missing witness. Therefore, the impropriety does not compel the defendant's conclusion.

III A, even if the state had not commented on the defendant's lack of corroboration of her own testimony, it presented strong evidence against her that provided a sufficient basis in itself for the jury's guilty verdict.[16] Based on our assessment of the *Williams* factors, the defendant has failed to demonstrate substantial prejudice by establishing that "the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Martinez*, supra, 95 Conn. App. 179.

IV

SENTENCING

We now address the defendant's final claim challenging the court's imposition of an enhanced sentence under § 14-227a (g). The defendant contends that, because her prior two convictions under the statute were entered on the same day, they should have counted as one conviction for purposes of sentencing. Therefore, in the present case, the defendant claims that she should have been sentenced as a second offender, rather than as a third offender. We disagree.

The following undisputed facts are relevant to this claim. On March 25, 2010, the jury in this case found the defendant guilty of violating § 14-227a (a) (1). Later, on the same day, the defendant was tried by the court on a part B information alleging that she had two prior convictions under § 14-227a (a). The court found that, in a prior criminal proceeding, the defendant sustained

---

[16] The defendant argues that the fact that a note submitted to the court by the jury after its initial deliberation indicated that the state's case was not particularly strong. The note read: "We are at an impasse and we don't see any change. Where do we go from here?" We are not persuaded that this note alone indicated weakness in the state's case, particularly in light of the court's subsequent acknowledgement that the jury had been deliberating for less than three hours when it issued the note and that "it is not uncommon for a jury to come to a *quick* impasse." (Emphasis added.)

two separate convictions on December 14, 2001, for operating under the influence in violation of § 14-227a. The defendant was sentenced on January 11, 2002, for both convictions. Consequently, the court found the defendant guilty on the part B information. On May 20, 2010, at the defendant's sentencing for the present conviction, the court found the defendant subject to the enhanced penalties required under § 14-227a (g) as a result of her two prior convictions.

"Because the defendant's . . . claim presents a question of statutory interpretation, our review is plenary. . . . Relevant legislation and precedent guide the process of statutory interpretation. [General Statutes § 1-2z] provides that, [t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Citation omitted; internal quotation marks omitted.) *State* v. *Surette*, 90 Conn. App. 177, 180–81, 876 A.2d 582 (2005).

Section 14-227a (g) provides in relevant part: "Any person who violates any provision of subsection (a) of this section shall . . . (3) for conviction of a third and subsequent violation within ten years after a prior conviction for the same offense, (A) be fined not less than two thousand dollars or more than eight thousand dollars, (B) be imprisoned not more than three years, one year of which may not be suspended or reduced in any manner, and sentenced to a period of probation requiring as a condition of such probation that such person perform one hundred hours of community service, as defined in section 14-227e, and (C) have such

person's motor vehicle operator's license or nonresident operating privilege permanently revoked upon such third offense. . . ."

The defendant argues that she "should have been sentenced as a 'second offender,' as opposed to a 'third offender,' based on the Supreme Court's reasoning in [*State* v. *Ledbetter*, 240 Conn. 317, 692 A.2d 713 (1997)]." In *Ledbetter*, the Supreme Court granted the state's petition for certification to appeal on the following question: "Does the persistent felony offender statute, General Statutes § 53a-40 [(f)],[17] apply when a defendant pleads guilty to two separate charges in the same proceeding?" (Internal quotation marks omitted.) Id., 321. The court held that "the legislative purpose of § 53a-40 [(f)] is fulfilled only by requiring a sequence of offense, conviction and punishment, thus allowing a felon the opportunity to reform prior to being labeled a persistent felony offender." Id., 332.

Based on her assessment of the legislative history of § 14-227a (g), the defendant argues that the statute " 'addresses the issue of recidivism and does so in a manner that is clearly punitive' " like the persistent offender statute analyzed in *Ledbetter*. Therefore, the defendant argues that the same sequence of offense, conviction and punishment required by the court's holding in *Ledbetter* should have occurred, but did not, for both of her prior convictions before she could be deemed a third offender. Because the defendant's two prior convictions were entered on the same day, she claims that she was improperly convicted as a third offender rather than as a second offender.

---

[17] The language of § 53a-40 (f) was formerly located at § 53a-40 (d). Section 53a-40 (f) provides: "A persistent felony offender is a person who (1) stands convicted of a felony other than a class D felony, and (2) has been at separate times prior to the commission of the present felony, twice convicted of a felony other than a class D felony."

The defendant's reliance on *Ledbetter* and the legislative history of § 14-227a (g) is misplaced because the plain language of the statute controls the outcome in this case. As we noted in *State* v. *Surette*, supra, 90 Conn. App. 181, "[the] language [of § 14-227a (g)], evincing a sentence enhancement design, is plain and unambiguous. Nowhere does the statute require, as a condition to the imposition of enhanced penalties for a third [conviction], that a defendant must have been convicted previously of being a second time offender. To the contrary, the statute speaks only in terms of prior convictions of § 14-227a, operating a motor vehicle while under the influence of intoxicating liquor." Because the defendant in this case, at the time of her conviction under the part B information, already had been convicted twice for violations of § 14-227a, the enhancement scheme plainly was applicable to her. Unlike the persistent offender statute considered in *Ledbetter*, § 14-227a (g) contains no qualifying language requiring the convictions to take place at separate times. Because the defendant's March 25, 2010 conviction for violating § 14-227a was the defendant's third conviction under the statute, the court properly applied the enhanced penalties of subsection (g) for third time offenders in sentencing the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.