******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* KEVIN
PATRICK CAMPBELL
(AC 35571)

Gruendel, Bear and Flynn, Js.

*Argued November 12, 2013—officially released April 15, 2014*

(Appeal from Superior Court, judicial district of
Litchfield, Ginocchio, J.)

*Moira L. Buckley*, for the appellant (defendant.)

*Timothy J. Sugrue*, assistant state's attorney, with
whom, on the brief, were *David M. Shepack*, state's
attorney, and *Dawn G. Gallo*, senior assistant state's
attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Kevin Patrick Campbell, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53-54a, as enhanced by General Statutes § 53-202k for having used a firearm. On appeal, the defendant claims that (1) the court improperly marshaled evidence during the jury charge; (2) the court abused its discretion in granting the state's request to make a missing witness argument; (3) the court erroneously precluded the testimony of proffered defense expert witnesses, Peter Morgan and Gregory Danas; and (4) prosecutorial impropriety deprived the defendant of a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On June 27, 2008, the five members of a group called the Forbidden Motorcycle Club (club) held a weekly meeting at their clubhouse in Torrington. The members of this group included the victim, Roland Lagasse; the defendant; the defendant's brother, James Campbell (Campbell); Eugene Thebarge; and Jerome Welsh. These members sat around a table to discuss "usual club stuff . . . about what happened [in] previous weeks, what club members have done, [and to] pay dues." After finishing with old business, they moved on to new business. The victim announced that Welsh would receive his one year patch, demonstrating that he had fulfilled all his duties associated with the club. An argument thereafter ensued between the victim and Campbell.[1] Thebarge testified that "[the victim] was trying to make a point . . . and [Campbell] kept seeming to interrupt him." The defendant "would chime in once in a while to [Campbell's] defense to help [Campbell] make his point." The victim "started to get a little steamed, a little angry" and "after [the victim] got fed up with [Campbell] interrupting him, he said, 'Do you want to step outside and settle this old school?' " and Campbell said, "Yeah, if that's what you wanna do." The defendant also got up and said, "Yeah, I'll go outside." All five members then went outside, led by the victim. The victim then "struck [Campbell] with his right hand on the left temple . . . knocking [him] up against the building, where [he] hit the building and slid down." "[A]fter [the victim] knocked [Campbell] against the building . . . [the defendant] was approaching, and [the victim] . . . [said] 'What, you want some too?' [The defendant said] 'Yeah, I want some . . . you fucked up now, you're a dead man.' " Thebarge further testified that as the defendant was making that statement, he saw the defendant "kind of fumbling around on the right side . . . and that's when the pistol came out, and [he] kind of cocked his head forward, drew the pistol up straight, and then pulled the trigger."[2] The victim then stumbled back a step or step and a half and fell backward. Thebarge asked the

defendant, "What . . . did you do . . . ?" And the defendant said, "I . . . killed him." Thebarge began cardiopulmonary resuscitation on the victim and told his fiancé, Jennifer Mercado, to call 911. Police officers arrived shortly thereafter and asked who the shooter was, to which the defendant replied, "I am."

The defendant thereafter was arrested and charged with murder with a firearm. The case proceeded to a jury trial, after which the jury found the defendant guilty. The court rendered judgment accordingly and sentenced him to a total effective term of thirty-five years incarceration, with a five year enhancement, for a total effective sentence of forty years. This appeal followed.

I

The defendant first claims that the court improperly marshaled evidence during the jury charge, which he argues deprived him of his constitutional right to a fair trial. Assuming, without deciding, that the court improperly marshaled evidence, we conclude that, in considering the charge as a whole, the error was harmless.

The following additional facts are relevant to this claim. The defendant testified that the victim first hit Campbell with three or four quick punches to the head until he fell to the ground. The victim then continued to hit and kick Campbell while he was down. According to the defendant, Thebarge also was standing nearby, with brass knuckles in his right hand, striking his fist into his left palm. The defendant told the victim, twice, to stop hitting Campbell, and after the second time, the victim charged at the defendant asking him, "you want some too?" After the victim hit the defendant, the defendant reached for the gun in the waistband of his pants. The defendant testified that he drew his gun in order to stop any further violence, but that he did not intend to shoot it. Rather, he stated that he caused the victim's death accidentally when the gun went off unintentionally. As an alternative to the lack of intent defense, the defendant also claimed that he was acting in self-defense.

In its charge to the jury, the court instructed: "You must follow all my instructions and not single out some and ignore others. They are all equally important. You are the sole judges of the facts. It is your duty to find the facts. You are to recollect and weigh the evidence and form your own conclusions as to what the ultimate facts are." The court cautioned: "In this case the defendant testified. An accused person having testified, stands before you just like any other witness. . . . You have no right to disregard his testimony or to disbelieve his testimony merely because he is accused of a crime."

The court then addressed the substance of the murder charge against the defendant, stating: "I will now

instruct you on the law applicable to the charge of murder. Following that I will instruct you on the elements of what are called the lesser included offenses. And as I will advise you further, as I address such offenses, you are to consider . . . any of them only in the event that you find the defendant not guilty of the charge of murder. . . . A person is guilty of murder when with intent to cause the death of another person he causes the death of such person." The court went on to address each element of the crime of murder with a firearm, and the state's burden to prove each element. It further detailed the issue of self-defense and its application to the charge of murder.

The court thereafter addressed the lesser included offenses of manslaughter in the first and second degrees with a firearm, again instructing the jury that it must find that the defendant was not guilty of murder before considering the lesser included offenses. In its instructions on the lesser included offenses, the court addressed the first element required for the state to prove a person guilty of manslaughter in the first degree: "The first element is that the defendant engaged in conduct that created a grave risk of death. Pointing a loaded weapon at another person may be considered conduct that inherently creates a risk of death. The inference is not a necessary one." It further explained: "Displaying a loaded gun that accidentally discharges, even without the intent to achieve a wrongful purpose, may provide evidence of lack of due care sufficient to support a finding of reckless criminal culpability. . . . The state of mind amounting to recklessness may be inferred from conduct. The inference is not a necessary one."

"The standard of review for a challenge to the propriety of a jury instruction is well established. [J]ury instructions are to be read as a whole, and instructions claimed to be improper are read in the context of the entire charge. . . . A jury charge is to be considered from the standpoint of its effect on the jury in guiding it to a correct verdict. . . . The test to determine if a jury charge is proper is whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [I]nstructions to the jury need not be in the precise language of a request. . . . Moreover, [j]ury instructions need not be exhaustive, perfect or technically accurate, so long as they are correct in law, adapted to the issues and sufficient for the guidance of the jury." (Citations omitted; internal quotation marks omitted.) *McDermott* v. *Calvary Baptist Church*, 263 Conn. 378, 383–84, 819 A.2d 795 (2003).

"The purpose of marshalling the evidence, a more elaborate manner of judicial commentary, is to provide a fair summary of the evidence, and nothing more; to attain that purpose, the [trial] judge must show strict

impartiality. . . . The influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling. . . . To avoid the danger of improper influence on the jury, a recitation of the evidence should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention. . . . Even where the defendant has presented no evidence, the [trial] court's summary of the evidence should try to give fair recognition to relevant points raised by the defense in cross-examination as well as to the general theory of the defense. . . .

"In addition, a court must take care to avoid making improper remarks which are indicative of favor or condemnation . . . and must not indulge in an argumentative rehearsal of the claims of one side only. . . . Such proscriptions are of heightened importance in a criminal case, where considerations of due process require that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the state's accusations. . . . [P]artisan commentary, if fairly established by the record . . . deprives defendants of the very essence of their constitutional right to a fair trial by an impartial jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Hernandez*, 218 Conn. 458, 462–63, 590 A.2d 112 (1991).

Nevertheless, "[i]t is well established that a court may comment to the jury on the weight of the evidence as long as it does not direct the jury as to how to resolve a particular question. . . . In fact, in some cases it is the trial court's duty to refer to testimony in order to assist the jury in relating the facts to the law. . . . Jury instructions must go beyond a mere recitation of legal principles. . . . It would be a Herculean task, and not one required under our law, for the trial court to achieve exact parity in the time spent on comments of both the prosecution and defense portions of a case. [T]he fact that the claims or evidence of one party are stated at much greater length than those of the other does not by itself render the court's summary of the evidence in its charge unfair." (Citations omitted; internal quotation marks omitted.) *State* v. *Cazimovski*, 20 Conn. App. 190, 192–93, 565 A.2d 254 (1989).

The defendant claims that because the court used the words "[p]ointing a loaded weapon," it implicitly instructed the jury that the defendant intended to aim the gun in a particular direction. The defendant further argues that the marshaling during the instruction was harmful because, although the jury heard it in relation

to the manslaughter charge, the jury would have applied that instruction to the murder charge as well. He concludes, then, that he was deprived of his constitutional right to a fair trial. The state, in contrast, argues that the court's instruction was given solely in the context of explaining the grave risk and reckless conduct elements of the two lesser manslaughter offenses. It argues that the court stated and restated that the jury must first deliberate on the charge of murder and must stop if it reached a unanimous verdict of guilty. Because the jury found the defendant guilty of murder, the state claims that the jury never reached any of the lesser included offenses, and therefore did not consider the instructions that were given for those lesser offenses. We agree with the state.

We need not decide whether the marshaling of evidence was done in error because, even if we assume it was error, it was harmless beyond a reasonable doubt. See *State* v. *Latour*, 276 Conn. 399, 412, 886 A.2d 404 (2005); see also *State* v. *Reynolds*, 264 Conn. 1, 60, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). "If an improper jury instruction is of constitutional magnitude, the burden is on the state to prove harmlessness beyond a reasonable doubt. . . . An alleged defect in a jury charge which raises a constitutional question is reversible error if it is reasonably possible that, considering the charge as a whole, the jury was misled. . . . In performing harmless error analysis, we keep in mind that [i]n determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge." (Internal quotation marks omitted.) *State* v. *Youngs*, 97 Conn. App. 348, 360–61, 904 A.2d 1240, cert. denied, 280 Conn. 930, 909 A.2d 959 (2006).

We first note that the portion of the manslaughter instructions that the defendant challenges on appeal was repeated only twice in the court's lengthy charge that included instructions on the jury's function in weighing the evidence, the burden of proof, the elements of the crimes, and the requirement that the state prove each and every element of the crime charged beyond a reasonable doubt. Additionally, in instructing the jury that pointing a weapon at an individual may be considered conduct that inherently creates a risk of death, the court did not state or infer that the state had proved the factual predicate. Rather, the court was simply instructing the jury on a point of law that such behavior, if proven, would satisfy a legal requirement for culpability. See *State* v. *Ciullo*, 140 Conn. App. 393,

411, 59 A.3d 293, cert. granted on other grounds, 308 Conn. 919, 62 A.3d 1133 (2013).

Furthermore, a court is allowed to refer to evidence in order to help the jury understand how the facts relate to the law. See *State* v. *Cazimovski*, supra, 20 Conn. App. 192. In reading the instructions as a whole, we conclude that the defendant's theory of defense was fairly presented.[3] The court did not state that *the defendant* pointed his gun at the victim, which would have directed the jury as to the defendant's state of mind. Rather, it made a general statement of law that "[p]ointing a loaded weapon at another person may be considered conduct that inherently creates a risk of death."[4] The court further stated in its instructions that "[d]isplaying a loaded gun that accidentally discharges . . . may provide evidence of lack of due care sufficient to support a finding of reckless criminal culpability." The latter statement reflects on the defendant's theory of the case, namely, that the gun went off unintentionally, after he displayed it to stop any further violence from occurring. The court therefore demonstrated strict impartiality by not reciting the evidence "as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention." (Internal quotation marks omitted.) *State* v. *Hernandez*, supra, 218 Conn. 462.

In addition, any alleged improper marshaling occurred during the instructions on, and applied solely to, the lesser included offenses, and therefore it did not cause harm to the defendant with regard to the murder charge on which he was found guilty. "Our jurisprudence is clear . . . that unless there is a clear indication to the contrary, a jury is presumed to follow the court's instructions." (Internal quotation marks omitted.) *State* v. *Boscarino*, 86 Conn. App. 447, 460, 861 A.2d 579 (2004). The court reiterated multiple times throughout its instructions that "you are to consider . . . [the lesser included offenses] only in the event that you find the defendant not guilty of the charge of murder." Because the jury is presumed to have followed the court's instructions when it was deliberating on the murder charge, and because the jury found the defendant guilty of murder, it had no reason to consider the court's manslaughter instructions. We therefore conclude that any such marshaling error was harmless.

## II

The defendant next claims that the court abused its discretion and committed reversible error by allowing the state to comment on a missing witness during summation. Although we conclude that the court erred in allowing the state to make a missing witness argument, the error was harmless.

The following facts and procedural history are necessary for our analysis. The state requested permission through written motion, and through argument to the court, to make comments in its closing argument about the absence of Campbell from the defendant's case. The state argued in its motion that "the defendant testified that [Campbell] was beaten extensively by the victim, which was the catalyst for the defendant drawing his firearm . . . [and] that he had [a] conversation with [Campbell] after the shooting. . . . During the first trial of this case,[5] the defense called [Campbell] as a witness, in an attempt to corroborate the defendant's entire version of events, including his description of the beating which [Campbell] sustained at the hands of the victim, and the events which occurred thereafter. . . . Campbell is a witness that the jury would naturally expect the defendant to call; he is available; and his absence bears on the weakness of the defendant's case."

The state argued to the court that, during cross-examination of the defendant, it established Campbell's availability by asking the defendant if Campbell currently enjoyed good health, and it also confirmed that he resided in Plymouth.[6] The state then argued that Campbell had indicated in his prior testimony, at the defendant's first trial, that he had been struck multiple times by the victim and that the defendant was on the ground when Campbell uncurled himself from the fetal position. The state also argued that because Campbell's statement to the police was inconsistent with his testimony at the first trial, he was impeached; and this was the reason the defendant failed to call Campbell to testify. The state then argued that it was fair to make a missing witness argument to the jury.

Defense counsel rebutted the state's argument and claimed that the testimony of the defendant about Campbell enjoying good health and residing in Plymouth was a result of forceful cross-examination by the state, and that in fact, the defendant testified that he had not seen or talked to Campbell in two years. Defense counsel thus concluded that because the state failed to demonstrate that Campbell was available, failed to show that harm to the defendant was the only reason why the defendant would not call Campbell to testify, and failed to articulate how Campbell's testimony would have been detrimental to the defendant, it could not make a missing witness argument.

The court ruled that the defendant "testified that . . . Campbell was either kicked or beaten a total of ten times. That goes to a very important issue in this case as to the amount of force that [the victim] was using on . . . Campbell, and the inference the jury could draw is that he was about to use that same force on [the defendant]. It's a critical issue in the case, and one would naturally believe that the defendant would want to call the biological brother of the defendant to

at least corroborate that's what, in fact, took place. . . . [T]he state did put on the record that there was availability." The state, in its closing argument, was thus permitted to make the statement: "[T]he other thing you need to consider . . . when you look at the relative strength of the state's [case], you have only [the defendant] telling his version of events. As it related to the strengths of the defendant's case, where's [Campbell]?"

"We review the court's decision allowing the state to include a missing witness argument in its closing argument for abuse of discretion. . . . It is within the discretion of the trial court to limit the scope of final argument . . . . The broad discretion vested in trial courts by [*State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000)] mirrors the general standards regarding the trial court's ability to limit closing argument. [T]he scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . We first determine whether the trial court abused its discretion in light of the information before the court when it ruled on the motion. If there was such an abuse of discretion, the reviewing court must determine whether the defendant has established that, in light of the totality of evidence at trial and the trial court's subsequent instructions to the jury, the impropriety constituted harmful error." (Citations omitted; internal quotation marks omitted.) *State* v. *Jordan*, 118 Conn. App. 628, 638–39, 984 A.2d 1160 (2009), rev'd on other grounds, 305 Conn. 1, 44 A.3d 794 (2012).

## A

We first assess whether the court abused its discretion in granting the state's motion to make a missing witness argument to the jury. "In *State* v. *Malave*, [supra, 250 Conn. 739] our Supreme Court abandoned, in criminal cases, the [rule of *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960)], also known as the missing witness rule, which sanctioned, under certain circumstances, a jury instruction that an adverse inference may be drawn from the failure of a party to produce a witness. Although our Supreme Court abandoned the *Secondino* rule, it did not intend to prohibit counsel from making appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case. . . . Comments in closing argument that do not directly exhort the jury to draw an adverse inference by virtue of the witness' absence do not necessarily fall under the ambit of *Secondino* . . . and accordingly are not forbidden by *Malave*. Our Supreme Court further provided that [o]f course, the trial court retains wide latitude to permit or preclude such a comment, and may, in its discretion,

allow a party to adduce additional evidence relative to the missing witness issue. . . .

"A missing witness argument is appropriate in limited circumstances. Counsel may only invite the jury to draw reasonable inferences on the basis of facts in evidence, and the court's exercise of discretion as to whether to permit such argument is dependent on the facts made known to it. For this reason, it is necessary for counsel, through facts and argument, to justify a request to make a missing witness argument. Our decisional law reflects, for example, that . . . counsel should explain how the [opposing party's] decision not to call [a person as a witness] exposed a weakness in the [opposing party's] case and should make an offer of proof regarding the substance of [such person's] potential testimony. . . . Stated otherwise, counsel must demonstrate that such witness was available to testify, set forth the substance of the testimony that such witness would have given had he been called to the witness stand and explain how his testimony would have been detrimental to the [opposing party's] case. Evidence that would have been merely cumulative or of no consequence to a reasonable assessment of the [opposing party's] case, for example, would not warrant such an argument. (Citations omitted; internal quotation marks omitted.) *State* v. *Mungroo*, 104 Conn. App. 668, 676–77, 935 A.2d 229 (2007), cert. denied, 285 Conn. 908, 942 A.2d 415 (2008).

The defendant argues that the missing witness argument was made in error because the state did not demonstrate through his testimony that Campbell was available to testify, as the defendant had not even spoken with Campbell in two years.[7] We agree.

"When proving availability, counsel seeking to make the missing witness argument must first offer evidence to support the witness' availability and the court must make a finding that the witness was actually available to testify. . . . [A] party cannot merely comment on the failure of the opposing party to present a witness without first providing a factual or evidentiary foundation from which to infer a weakness in the opposing party's case." (Internal quotation marks omitted.) *State* v. *Burns*, 140 Conn. App. 347, 372, 59 A.3d 819, cert. denied, 308 Conn. 918, 62 A.3d 1132 (2013).

We conclude that the court erred in finding that the state put on sufficient evidence of Campbell's availability through its cross-examination of the defendant. "To satisfy the availability requirement, the [party] must put forth sufficient evidence before the jury to support a conclusion that the witness was available at the time of trial." *State* v. *Owen*, 40 Conn. App. 132, 138, 669 A.2d 606, cert. denied, 236 Conn. 912, 673 A.2d 114, cert. denied, 237 Conn. 922, 676 A.2d 1376 (1996). The state did not establish that Campbell was actually available to testify. Although it probed the defendant in an attempt to elicit evidence about whether Campbell was

available, the defendant testified that only "as far as he knew," Campbell still lived near Plymouth Lake and that he "believed" Campbell was still living, conscious, and competent. These statements, standing alone, are insufficient to establish Campbell's availability to testify during the trial.[8] Without more definite and reliable evidence, the court erred in finding that Campbell was available. See *State* v. *Woods*, 257 Conn. 761, 768, 778 A.2d 933 (2001).

In fact, the present case is consistent with *State* v. *Jordan*, supra, 118 Conn. App. 639–40, in which we held that the trial court abused its discretion when it found three missing witnesses to be available. The prosecutor in that case asked two witnesses whether the missing witnesses "were in the area and available to testify," to which the witnesses responded "that they were." Id., 640. We held, however, that the state did not establish that any of the three witnesses included in the missing witness argument were actually available to testify. Id.

Moreover, we disagree with the state's comparison to *State* v. *Daniels*, 180 Conn. 101, 110, 429 A.2d 813 (1980). Our Supreme Court previously has stated that the defendant in that case "claimed that the state's [missing witness argument] was improper because the evidence was insufficient to show [the witness'] availability to testify. . . . We rejected [the defendant's] claim in light of the following colloquy between the state's attorney and [the defendant] during [his] cross-examination: 'Q. Who was there when you [returned home]? A. [The witness] and her kids. Q. Is she here today in court? A. No, she isn't. Q. Do you know where she is? A. She's home, I guess.' . . . The evidence further indicated that [the witness] was in [the defendant's] bed when he returned home and that he slept in that bed as well. . . . In light of the context in which [the defendant's] testimony was elicited, the trial court in *Daniels* reasonably could have concluded that [the defendant], who apparently had had an intimate relationship with [the witness], knew where [the witness] resided and, furthermore, that [the defendant] reasonably believed that she was at her residence when the state questioned him about her whereabouts. Indeed, the clear import of [the defendant's] testimony is that he knew where [the witness] was and how to find her." *State* v. *Woods*, supra, 257 Conn. 768 n.10. The conclusion in *Daniels*, therefore, is of no benefit to the state in the present case because no evidence was provided to demonstrate that the defendant was in contact with Campbell, and actually knew whether Campbell was available to testify. See also *State* v. *Leecan*, 198 Conn. 517, 540, 504 A.2d 480 (court found sufficient evidence of availability of witness because witness continued to occupy same residence she previously had shared with defendant and continued to communicate with defendant), cert. denied, 476 U.S. 1184, 106 S. Ct. 2922, 91 L. Ed. 2d 550 (1986).

We therefore conclude that the court abused its discretion in granting the state's motion to permit a missing witness argument to the jury. Consequently, we now turn to the second part of our analysis, which is whether that abuse of discretion constituted harmful error.

B

Our conclusion that the court abused its discretion in granting the state's motion for a missing witness argument does not end our inquiry; we also must determine whether the impropriety was harmful, thereby entitling the defendant to a new trial. "If there was such an abuse of discretion, the reviewing court must determine whether the defendant has established that, in light of the totality of evidence at trial and the trial court's subsequent instructions to the jury, the impropriety constituted harmful error." (Internal quotation marks omitted.) *State* v. *Burns*, 140 Conn. App. 347, 371, 59 A.3d 819, cert. denied, 308 Conn. 918, 62 A.3d 1132 (2013). "The dispositive question in harmful error analysis is whether we have a fair assurance that the defendant received a fair trial. . . . This may be determined by considering whether the jury's verdict was substantially swayed by the error. . . . The thrust of the standard is to look to the effect of the error and to determine if it had little to no impact on the defendant's conviction." (Internal quotation marks omitted.) Id., 374.

The defendant failed to demonstrate that the jury's verdict was substantially swayed by the court's error in allowing the state to make a missing witness argument. In the present case, the state made only one statement regarding Campbell's absence: "[T]he other thing you need to consider . . . when you look at the relative strength of the state's [case], you have only [the defendant] telling his version of events. As it related to the strengths of the defendant's case, where's [Campbell]?" The state's reference to Campbell was isolated to one comment within two sentences during its entire closing argument. It was not emphasized throughout, but rather was of minimal impact in relation to the totality of the evidence and arguments presented at trial.

Furthermore, the state did not ask the jury to draw an adverse inference from Campbell's absence, but simply asked the jury to consider "where's [Campbell]?" In fact, it would have been evident to the jury that Campbell did not testify. On the basis of the evidence before it, the members of the jury reasonably could have seen, even without the missing witness argument, that the defendant did not produce Campbell as a witness. See *State* v. *Ross*, 230 Conn. 183, 215–17, 646 A.2d 1318 (1994) (involvement of psychiatrist and psychologist in diagnosis of defendant and their absence from trial evident to jury), cert. denied, 513 U.S. 1165, 115 S. Ct.

1133, 130 L. Ed. 2d 1095 (1995). Campbell was the only person who corroborated the defendant's testimony that the victim extensively beat Campbell and was one of the reasons that the defendant thought it was necessary to take out his gun.

In addition, regardless of any inference the jury may have drawn from the state's missing witness comment, the state's evidence, including the defendant's statement, "you fucked up now, you're a dead man," provided a compelling case for conviction. Also, it is no more likely that the jury inferred that Campbell would have contradicted the defendant's testimony as it is that the jury inferred that he would have supported the defendant's testimony. See *State* v. *Burns*, supra, 140 Conn. App. 374–75.

In light of the evidence, we conclude that the jury's verdict was not materially affected by the admission of the state's isolated missing witness reference, and that the defendant received a fair trial. The court's error, therefore, was harmless.

### III

The defendant next claims that the court erroneously precluded the testimony of two proffered defense expert witnesses. We disagree.

"We first set forth the standard by which we review the trial court's determinations concerning the [admissibility] of evidence. The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Citations omitted; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 634, 881 A.2d 1005 (2005); see also Conn. Code Evid. § 7-2 ("[a] witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue").

"[A] trial judge should, by one method or another, serve as a 'gatekeeper' and make a preliminary assessment of the validity of scientific testimony before allowing the fact finder even to consider it." *State* v. *Porter*, 241 Conn. 57, 68, 698 A.2d 739, 746 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d

645 (1998). "[I]t is proper for trial judges to serve as gatekeepers for scientific evidence because a relevance standard of admissibility inherently involves an assessment of the validity of the proffered evidence. More specifically, if scientific evidence has no grounding in scientific fact, but instead is based on conjecture and speculation, it cannot in any meaningful way be relevant to resolving a disputed issue." Id., 74. "[S]ome indication of scientific validity—accomplished here by a showing of 'substantial' acceptance—is necessary for scientific evidence even to be relevant." Id. The factors that should be considered in conducting a methodological analysis, although not exclusive, include: "whether a scientific principle has gained general acceptance in making admissibility determinations . . . whether that methodology has been tested and subjected to peer review, and the known or potential rate of error . . . the prestige and background of the expert witness supporting the evidence can play a role in determining whether a novel technique employed by that individual is likely to have any scientific merit . . . [and] [t]he extent to which the scientific technique in question relies on subjective interpretations and judgments by the testifying expert, rather than on objectively verifiable criteria . . . ." (Citations omitted; internal quotation marks omitted.) Id., 84–86.

"[E]vidence, even evidence with its roots in scientific principles, which is within the comprehension of the average juror and which allows the jury to make its own conclusions based on its independent powers of observation and physical comparison, and without heavy reliance upon the testimony of an expert witness, need not be considered scientific in nature for the purposes of evidentiary admissibility." (Internal quotation marks omitted.) *State* v. *Griffin*, 273 Conn. 266, 278, 869 A.2d 640 (2005).

A

The defendant first claims that the court erroneously precluded the testimony of his expert Morgan. We disagree.

The following additional facts are relevant to this claim. The defendant proffered Morgan, a psychiatrist, to testify about a phenomenon known as "fight or flight."[9] The state filed a motion in limine and memorandum of law in support there of to exclude the testimony. The court excluded Morgan's testimony because it found that the witness would not be testifying as to scientific knowledge. It stated: "The doctor testified that this is a phenomenon that has been around for several decades. . . . It's something that [the jurors] possibly would know that anybody, based on their own common experience . . . would know that their heartbeat would probably increase, their blood pressure may go up."

The court further stated: "There is no history of this case or this type of science being subject to peer review, subject to this author publishing anything on it. . . . I think this testimony would be highly misleading to the jury explaining a phenomenon that really would eventually go back to his state of mind at the time of the shooting, and it really does invade the province of the jury." Because the court found that Morgan's testimony did not pass *Porter* scrutiny and went to the ultimate issue of the case, the court granted the state's motion in limine to exclude Morgan's testimony.

Our standard for admitting expert testimony is well established. "In *Porter*, our Supreme Court explicitly adopted the *Daubert* test to determine the admissibility of scientific evidence . . . [but it] did not explicitly overrule Connecticut precedent regarding the evidence to which such a test should apply. . . . Courts apply the *Daubert* standard only when such testimony involves innovative scientific techniques . . . . To determine if such a technique exists, we look to see whether the trier of fact is in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge. . . . Furthermore, we determine if the testimony is based on obscure scientific theories that have the potential to mislead [the trier of fact] awed by an aura of mystic infallibility surrounding scientific techniques, experts and the fancy devices employed. . . . If an expert's testimony concerns a method, the understanding of which is accessible to the [trier of fact] . . . and the value of the expertise lay in its assistance to the [trier of fact] in viewing and evaluating the evidence, the testimony is not scientific even though an expert's skill and training are based on science." (Citations omitted; internal quotation marks omitted.) *State* v. *Vumback*, 68 Conn. App. 313, 329–30, 791 A.2d 569 (2002), aff'd, 263 Conn. 215, 819 A.2d 250 (2003).

The defendant claims that Morgan passed *Porter* scrutiny and should have been allowed to testify. He further argues that Morgan's testimony did not go to the ultimate issue in the case because the ultimate issue focused on theories of self-defense and unintentional discharge, and Morgan's testimony would not have included references to the defendant or opine how experiencing fight or flight proved self-defense or negated intent. The state agrees with the court that Morgan's testimony embraced the ultimate issue of the defendant's mental state and concerned material that was not scientific or of specialized knowledge beyond the ken of the average juror. It argued that human reactions to stressful circumstances that give rise to a fight or flight response are matters that fall within the common experience of the average juror. We agree with the court.

Morgan's proffered testimony did not fall within the ambit of scientific, technical, or other specialized knowledge. As the court stated, the jury would likely be aware of such fight or flight responses as a result of their own experiences. The proffered testimony, therefore, was an attempt to provide expertise on "inferences which lay persons were equally capable of drawing from the evidence. It is only when an expert witness has a special skill or knowledge, beyond the ken of the average juror, on the particular subject at issue that his testimony can be helpful and, accordingly, should be admitted." *State* v. *George*, 194 Conn. 361, 373, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985). The court, therefore, did not abuse its discretion when it excluded Morgan's testimony for failing to pass *Porter* scrutiny.[10]

B

The defendant also claims that the court erroneously precluded the testimony of his expert Danas. We disagree.

The following additional facts are relevant to this claim. The defendant proffered the testimony of Danas, a self-employed firearms trainer, regarding firearm safety and the danger of unintentional discharge. The state filed a motion in limine and a memorandum of law in support thereof to exclude such expert testimony. The defendant objected, arguing that Danas expressed his opinion in reasonable probabilities, that he did not testify regarding the ultimate issue, and that the proffered testimony was beyond the ken of the average juror.

The court found that "there is no question that Gregory Danas appears to be qualified as an expert in the field of firearms, which would include operation, use, and maintenance of firearms, he also may be qualified as an expert in the safe handling of firearms. But the hypothetical question proposed by the defendant[11] appears to offer Mr. Danas as an expert in the area of firearms safety with regard to the unintentional discharge of a firearm and specifically the frequency of unintentional discharge of a firearm within the civilian population. If the court were to find [that] this proffered testimony of Mr. Danas was scientific or technical in nature and was to subject this witness' testimony as it relates to the issue of frequency of unintentional discharge of a firearm by a civilian to a *Porter* analysis, it would most certainly fail." The court went on to conclude that Danas "has indicated that he can count on one hand the number of times that he has had his trainees unintentionally discharge a firearm. . . . He has no statistics regarding the age, gender, or physical qualities of those trainees regarding said issue. All of Mr. Danas' observations were made in a controlled setting, he has not made any observations or submitted

any studies, data, statistics as they relate to the unintentional discharge of a firearm by civilians who are placed in a similar situation to that of [the defendant]. He has never had his theories or techniques subject to peer review or publication. Absent in his testimony is the known or potential rate of error, including the existence and maintenance of standards controlling the techniques, operations, and whether the technique is generally accepted in a relevant scientific community."

The court thus concluded that it was not "willing to compromise that standard of reasonable probability and move to a much lower standard which would permit an expert . . . to offer such an important conclusion or opinion couched in terms quite likely to be conducive to an unintentional discharge of a firearm. . . . [T]his expert witness wants to offer expert testimony, it goes to the heart of this case, and give[s] testimony that indirectly goes to the intent of the accused, which is ultimately within the sole function of the jury. The defense is asking the court to permit this testimony, which at best is couched in terms of possibility and arguably at worst it's couched in terms more consistent with conjecture and speculation."

Our standard regarding expert opinions is well established. "Expert opinions must be based upon reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability that an event has occurred does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony. . . . As long as it is clear that the opinion of the expert is expressed in terms of probabilities, the opinion should be submitted into evidence for a jury's consideration." (Internal quotation marks omitted.) *Peatie* v. *Wal-Mart Stores*, *Inc.*, 112 Conn. App. 8, 21, 961 A.2d 1016 (2009).

The trial court has a duty to act as a gatekeeper and must determine whether the method underlying proffered scientific evidence is admissible. See *State* v. *Porter*, supra, 241 Conn. 69. We agree with the court that Danas' testimony does not concern scientific, technical, or other specialized knowledge beyond the ken of the average juror. As the court stated, "people understand that when you have your finger on the trigger of a gun, you are allegedly being attacked, you have a prosthetic leg, you were off balance, you bump and fall, the risk of unintentionally discharging the gun is increased." Furthermore, when questioned by the state, Danas was unaware of the incidence of unintentional discharges of guns similar to the one used by the defendant and was similarly unaware of the incidence of

unintentional discharges in a situation where the person holding the gun is in the process of falling. Danas also testified that he was not aware of any articles that addressed the number of unintentional discharges occurring and admitted that he had never written a report on the issue. Danas, then, did not qualify as an expert on firearm safety with regard to the unintentional discharge of a firearm. The court, therefore, did not abuse its discretion by excluding Danas' testimony.

IV

The defendant lastly argues that the prosecutor misinformed the jury on the law regarding murder and self-defense, thus depriving the defendant of a fair trial. We are not persuaded.

During rebuttal summation, the prosecutor argued: "[S]elf-defense is a justification defense. So the court will tell you that before you can consider self-defense on the charge of murder, you have to find that the defendant intentionally caused the death of [the victim], okay, then you consider self-defense. . . .

"[T]he testimony of the defendant was that of accident. He reiterated time and time again that he did not intentionally pull the trigger. So he's asking you to adopt a defense, the opposite of that which he presented to you. . . . 'Accident' is just a simple failure of proof defense. All accident is, is the state failed to prove intent . . . that's an entirely different concept from a justification defense. Because in order for you to find that he acted intentionally and shot the guy, you've already rejected that he did it in self-defense based on his facts. So pay attention to those instructions, because accident and self-defense are legally inconsistent defenses. Can you raise inconsistent defenses as a matter of law? Absolutely. Is it practical? That's for you to consider."

"[T]he defendant's failure to object at trial to [this occurrence] that he now raises as . . . prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his [claim]. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 762, 51 A.3d 988 (2012).

The standard for prosecutorial impropriety is well settled. "[T]he touchstone of due process analysis in cases of alleged prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct

so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 571, 849 A.2d 626 (2004). "[T]he burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." *State* v. *Payne*, 303 Conn. 538, 563, 34 A.3d 370 (2012).

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 572.

Considered in light of the prosecutor's entire remarks in rebuttal, we cannot agree with the defendant that the statement amounted to prosecutorial impropriety and so infected the trial with unfairness as to make the resulting conviction a denial of due process. We agree with the state when it argued in its appellate brief that "[v]iewed properly in context, the remark constituted an accurate statement of the mutually exclusive nature of accident and self-defense, and an accurate statement regarding the defendant's testimonial claim of accident, not self-defense." The prosecutor properly pointed out to the jury that the defendant had inconsistent defenses, and that the jury could rely on only one theory: either self-defense or unintentional discharge. The statement did not shift the burden to the defendant to disprove intent before considering self-defense. Having determined that the defendant has not established impropriety by the prosecutor, the defendant's claim that he was deprived of a fair trial necessarily fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant testified that both he and Campbell believed that before a member received his one year patch, the club was required to discuss and to vote on whether it was earned by that member.

[2] The defendant carried his gun in a holster clipped to the inside of his pants, concealed by his shirt. He testified that he carried the gun every day since the September 11, 2001 terrorist attacks because he "thought it was a good idea to be armed."

[3] Unlike in *State* v. *Hernandez*, supra, 218 Conn. 465, where "the court extensively detailed the state's claims and its evidence in support thereof, and little or no reference was made to the defendant's exculpatory evidence and his theory of defense," the court in the present case presented the law, reflecting both the state's case and the defendant's theories of defense.

[4] At oral argument before this court, defense counsel claimed that "when the court tells the jury one side of the evidence, especially on such a crucial claim as to whether he pointed the gun at the [victim], its really telling the jury that [the defendant] is not credible . . . and that his defense is simply not worthy of belief." The trial court did not state in its instruction that the defendant pointed the gun, nor did it make any assessment as to the defendant's credibility.

[5] The defendant's first trial was in 2009, but the jury declared itself unable to reach a unanimous verdict and was discharged.

[6] During cross-examination, the following exchanges occurred between

the prosecutor and the defendant:

"[The Prosecutor]: By the way, when was the last time you spoke with [Campbell]?

"[The Defendant]: Probably two years ago."

"[The Prosecutor]: And [Campbell] lives in where, Plymouth?

"[The Defendant]: Yes.

"[The Prosecutor]: Whereabouts in Plymouth, do you know?

"[The Defendant]: Near the lake there, Plymouth Lake.

"[The Prosecutor]: Okay, still living there?

"[The Defendant]: As far as I know, yes."

"[The Prosecutor]: Still living, conscious, competent, nothing happened to him? Today, as we sit here today?

"[The Defendant]: I believe so."

[7] The state did not offer any other evidence of Campbell's availability to testify.

[8] The defendant did not testify that Campbell was available to testify, or even that he "would probably be able to testify," as was the case in *State* v. *Anderson*, 212 Conn. 31, 44, 561 A.2d 897 (1989). As a result, there was not enough evidence to conclude that Campbell was "within the power of [the defendant] to produce . . . and, therefore, available to testify." (Internal quotation marks omitted.) Id.

[9] Morgan testified outside the presence of the jury as follows: "[I]t's generally accepted that violence comes in different forms. . . . Affective violence is the emotional violence, so that usually is preceded by some highly emotional situation where the person perceives a threat either internal or external. They become very emotional. . . . They become violent for the sole purpose of reducing that threat trying to get rid of it. . . . [I]t often occurs in cases where the person does not have repeated episodes of violence but it's just a single episode. . . .

"Predatory violence is different in that there's not the emotional component. There isn't the perception of threat. The goal of predatory violence is not threat reduction . . . .

"Fight or flight is the body's response to the perception of danger. It could be danger to the person, him or herself, or it could be danger to someone else close by. This is an instinctive response. . . . When the danger is perceived, the brain recognizes that and sets a series of things into motion, and this causes a release of chemicals in the brain that shut down some parts of the brain and turn on others. It also causes the adrenal glands to release epinephrine. Epinephrine goes around the body, and it will do things like increase heart rate; it will increase blood flow to muscles; [it] will decrease blood flow to things that are considered not important in the situation . . . [and] it will increase the diameter of the tubes in your lungs so that more air can come in and out. The net effect is to make someone stronger, to make them faster, make them more able to deal with the threat that they're perceiving.

"At the same time, their ability to recognize other things around them may be diminished. So people who experience this report things like tunnel vision for a diffuse sense of awareness . . . being focused and, in a way, almost not able to focus on anything other than following what's happening, getting rid of the threat. People who experience this feel like they aren't necessarily in full control, but sometimes are like a passenger going on in something like slow motion time to deal with the threat that's being perceived."

[10] We further note that even if the court did abuse its discretion in excluding Morgan's testimony, it was harmless in the present case.

[11] The defendant posed the following hypothetical question: "[A]ssuming that the person wearing that gun and drawing that gun . . . does not have the training and has physical handicaps, would that scenario be conducive to an unintentional discharge under those circumstances?" Danas answered, "[q]uite likely, yes, sir." The court noted that the defendant "said that his case was going to rest on that one hypothetical."