******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* STEPHEN
JOHN BARONE
(AC 35244)

Gruendel, Beach and Lavery, Js.

*Argued October 8, 2014—officially released January 6, 2015*

(Appeal from Superior Court, judicial district of
Danbury, geographical area number three, Pavia, J.)

*Sean P. Barrett*, with whom, on the brief, was *Peter
G. Billings*, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with
whom, were *Deborah P. Mabbett*, senior assistant state's
attorney, and, on the brief, *Stephen J. Sedensky III*,
state's attorney, and *Jason Germain*, senior assistant
state's attorneys, for the appellee (state).

*Opinion*

LAVERY, J. The defendant, Stephen John Barone, appeals from the judgment of conviction, rendered following a jury trial, of one count of operating a motor vehicle while under the influence of intoxicating liquor and one count of operating a motor vehicle while having an elevated blood alcohol content in violation of General Statutes § 14-227a (a) (1) and (2), respectively.[1] The defendant claims that the court improperly (1) denied his motion to suppress evidence that the police obtained during their allegedly unlawful stop of his automobile in violation of the fourth amendment to the federal constitution, and (2) denied his motion to confront witnesses, or, in the alternative, to suppress evidence regarding certain breath tests in violation of the confrontation clause of the sixth amendment to the federal constitution.[2] We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. At approximately 9:16 p.m. on February 11, 2011, the Redding Police Department received a 911 emergency telephone call from Meredith Hettler. Hettler was a passenger in a vehicle being driven by her husband, Mike Sherman. Hettler and Sherman had departed from a restaurant on Route 53 in Redding and were returning to their home in Bethel. Hettler became concerned when the vehicle in front of them swerved across the double yellow line in the center of the road. Hettler called 911 and identified herself by providing her name, address, and telephone number. She described the vehicle as a blue Subaru Outback, and provided the vehicle's license plate number to the 911 operator. Hettler observed the Subaru traveling at approximately twenty-five to thirty miles per hour in a forty-five mile per hour zone. Hettler and Sherman followed the motorist for approximately one half of a mile before the Subaru pulled off the roadway and onto the side of the road. Hettler did not describe the physical characteristics of the driver to the 911 operator, nor did she indicate if the driver was distracted. The Redding Police Department contacted the Bethel Police Department, and the dispatcher issued a police radio broadcast for officers to "be on the lookout" for the vehicle. Officer James Christos of the Bethel Police Department was dispatched to Route 53 where the Subaru last was seen. Christos was unable to locate the vehicle and he eventually left the immediate area.

Approximately forty-five minutes later, at about 9:55 p.m., the Bethel Police Department received a telephone call from Todd Sterling, another concerned motorist. Sterling testified that he informed the 911 operator that he was approaching the intersection of Routes 107 and 58, entering Bethel, when he observed a blue Subaru at "a stop sign . . . parked there, just

stopped, totally stopped and not going." Sterling told the 911 operator that he had sounded his car horn because he believed that the driver of the Subaru had fallen asleep at the wheel. After he sounded his horn, the vehicle continued driving and Sterling drove behind the Subaru for approximately two miles as it proceeded down Route 58, "going twenty [miles per hour in a forty to forty-five mile per hour zone], swerving all over the double yellow [line]." Sterling became concerned that someone was "going to get killed" and, accordingly, he called 911. Sterling identified himself to the 911 operator by providing his name, address, and telephone number. He also provided the vehicle's make and license plate number. The license plate number that Sterling provided was identical to the one reported by Hettler.

At around 10 p.m., approximately five minutes after Sterling called 911, Officer Frank O'Farrell of the Bethel Police Department, was traveling north on Maple Avenue in an unmarked police vehicle. O'Farrell saw a vehicle stopped for an extended period of time at a stop sign at the intersection of Maple, Hickok and Milwaukee Avenues "for no apparent reason." He indicated that there were no other vehicles at the intersection at that time. O'Farrell then realized that the stationary vehicle fit the general description of the vehicle that had been the subject of the earlier "be on the lookout" alert. Upon confirming with the police dispatcher that the make, model, and license plate of the vehicle he observed was the subject of the earlier alert, O'Farrell activated his lights in order to pull the vehicle over. The Subaru proceeded slowly through the intersection, traveled an additional one hundred yards past the first area where it could have safely pulled over, then gradually pulled off the road on to a grassy shoulder. The driver subsequently was identified as the defendant. O'Farrell approached the driver's side of the Subaru and requested the defendant's license, vehicle registration, and insurance information. O'Farrell detected the smell of alcohol on the defendant's breath and he observed the defendant's "slow and slurred speech." After three requests were made, the defendant, who was "[f]umbling around" and "[s]eemed confused," located his driver's license, which had been on his lap, and provided it to O'Farrell. The defendant told O'Farrell that he had consumed three glasses of wine that evening.

At this time, Christos, who had responded to the first 911 report, arrived at the scene. On the basis of his conversation with O'Farrell, Christos had reason to believe that the operator of the vehicle was intoxicated. Christos approached the vehicle to interview the defendant and detected the odor of alcohol on the defendant's breath. He noticed that the defendant's speech was "very slow and deliberate." The defendant exited the vehicle upon request, but "had a lot of trouble balancing, standing, [and] walking." Christos administered three standardized field sobriety tests to the defendant, all of

which he failed.[3] Christos concluded that the defendant was operating his vehicle while under the influence of alcohol and placed him under arrest. The defendant was then transported to the Redding Police Department for breath test sampling using the "Draeger Alcotest 9510" (Draeger machine).[4] The first sample, taken at 10:38 p.m., indicated that the defendant's blood alcohol concentration (BAC) was 0.1778. The second sample was taken at 11:02 p.m. and produced a BAC of 0.1627. Both of the tests performed indicated that the defendant's blood alcohol concentration was above the legal limit set forth in § 14-227a (a) (2).[5] The defendant was then transported back to the Bethel Police Department where he was fingerprinted and photographed.

The defendant was charged by way of a two part substitute long form information. In part A, count one charged the defendant with operation of a motor vehicle while under the influence of intoxicating liquor, in violation of § 14-227a (a) (1). Count two charged the defendant with operation of a motor vehicle while having an elevated blood alcohol content, in violation of § 14-227a (a) (2). The defendant was not charged with a motor vehicle infraction.

On September 13, 2011, the defendant filed a "Motion to Suppress Defendant's Statements and Field Sobriety Tests," seeking suppression of all evidence obtained after the stop of the defendant's automobile, including observations by the police officers and any statements made by the defendant. The court denied the motion after a hearing. Subsequently, the defendant filed a "Motion in Limine Requesting Confrontation or, in the Alternative, Suppression," and an accompanying memorandum of law, requesting suppression of the breath test results if the state did not present the testimony of the breath test operator, the calibration analyst, the quality assurance specialist, and the ethanol breath standard analyst. On the second day of trial, the court denied the motion, concluding that the defendant's right to confrontation would not be violated because Christos, who had operated the Draeger machine, and Robert H. Powers, the Director of the Controlled Substances and Toxicology Laboratory at the Department of Emergency Services and Public Protection, were present for "full, fair, and complete cross-examination [by the defendant] on all issues relating to the accuracy of the [Draeger machine]."

At trial, the state presented Powers with a hypothetical situation that contained certain relevant facts identical to those relied on by the state in the present case. Powers testified with a reasonable degree of scientific certainty that, in his opinion, the defendant's BAC was above 0.168 at 10 p.m. on the night of his arrest. When presented with the same hypothetical, Michael P. Hlastala, a doctor called as a defense expert, opined that at 10 p.m. the defendant's BAC would still be over the

legal limit of 0.08. At the conclusion of the evidence, the defendant moved for a judgment of acquittal that the court denied.

On September 14, 2012, the jury found the defendant guilty of operating a motor vehicle while under the influence of intoxicating liquor and operation of a motor vehicle while having an elevated blood alcohol content. The defendant was charged in part B of the information with previously having been convicted of one count of the crime of operating a motor vehicle while under the influence of intoxicating liquor or drugs, in violation of § 14-227a. Following the guilty verdict as to part A, the defendant pleaded guilty to part B of the information and, on November 20, 2012, the court sentenced the defendant to two years imprisonment, execution suspended after six months, a $2000 fine, and three years probation with various conditions. On December 6, 2012, the defendant filed the present appeal.

I

The defendant first claims that the court improperly denied his motion to suppress evidence from the motor vehicle stop because O'Farrell did not have a reasonable and articulable suspicion that the defendant was engaged in or about to commit criminal activity, as required by the federal constitution to effectuate the stop. We disagree.

"Pursuant to *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), a police officer has authority, under the fourth amendment to the United States constitution, to stop the driver of a car if the officer has a reasonable and articulable suspicion that the driver has engaged in illegal conduct." *State* v. *Torelli*, 103 Conn. App. 646, 648, 931 A.2d 337 (2007). "Our review of *Terry* stop claims is governed by a well established standard of review. The determination of whether reasonable and articulable suspicion exists rests on a two part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts give rise to such a suspicion is legally correct." (Internal quotation marks omitted.) Id., 650; see also *State* v. *Cyrus*, 297 Conn. 829, 837–38, 1 A.3d 59 (2010).

At the conclusion of the hearing on the defendant's "Motion to Suppress Defendant's Statements and Field Sobriety Tests," the court made the following factual findings and denied the motion. "[T]he court, having heard the testimony of the officer in this case, Officer O'Farrell, does find the officer to be credible in his account of what occurred on [February 11, 2011] in that, just before or at 10 p.m. on that particular evening, he saw a vehicle that was at a stop sign for a prolonged period of time. Although there were no vehicles crossing through that [intersection], this particular vehicle seemed to remain at the stop sign with no movement for

a long enough period of time that it drew his attention to the vehicle.

"After kind of observing the vehicle and trying to see why the vehicle was not moving and realizing that, in fact, there was no traffic that should have been stopping this vehicle, the officer then did call in and was able to confirm that this particular vehicle was consistent, and had a consistent plate number, with [the vehicle] that they had received information on [from Hettler and Sterling's 911 calls]. That the information the police had was that at 9:16 and at 9:55 [p.m.] two separate and independent callers had taken the time to call in by way of 911 their concern about this particular vehicle in terms of its operation.

"[W]hile this officer was not clear in terms of his belief that at least one of the callers was [reporting] an erratic operation of the vehicle, I know that that was an argument . . . whether they both said erratic or whether one said erratic. But there was information given to the police that was relayed to this officer in terms of some type of erratic behavior, certainly enough that it warranted two separate callers to call in.

"That this officer, then, in the court's view, did have reasonable and articulable suspicion to at least inquire, for several reasons; and, as the officer indicated . . . [there are] several issues that are involved. One is whether an infraction has occurred or some type of violation of the law. The [second] is whether this person is in distress and needs some type of treatment, and the third is, obviously, that now we have the callers [reporting] the erratic operation, which this officer is also confirming in terms of hi[m] personal[ly] . . . seeing the defendant stopped for no reason at all for a prolonged period of time at the stop sign.

"[T]he calls are within a short window, in a similar area, and that the 9:16 [p.m.] call, although in Redding, is consistent with the vehicle being at the particular location that it's in at that 10 p.m. timeframe.

"When the officer then goes to inquire . . . his investigation is heightened by what he describes as slow and slurred speech, a confusion on the defendant's part, the odor of alcohol, his inability to follow instructions in that he's attempting to obtain his driver's license but is unable to do so, even though, ultimately, his driver's license is on his lap, and that is eventually pointed out to him. All of those things then are permissible in terms of allowing the police to continue [investigating] what was a reasonable and articulable suspicion . . . of whether or not a crime has occurred.

"Having said that, the court denies the defendant's motion to suppress the statements and the evidence obtained [from the stop of the defendant's motor vehicle]. Now, that does not mean that all of these things come into evidence at trial. I'm not suggesting that. My

only issue for right now is whether or not the court is finding that the initial stop of the defendant's vehicle was illegal and in violation of the constitution, and the court's ruling is that, based on the circumstances at the time . . . it was not; and, therefore, the motion to suppress is denied."

On appeal, the defendant argues that the court erred in concluding that O'Farrell had a reasonable and articulable suspicion to effectuate the stop.[6] The defendant, thus, challenges the propriety of the court's legal conclusion that the facts provided a sufficient basis for O'Farrell to form a reasonable and articulable suspicion that the defendant was engaged in illegal conduct, justifying a *Terry* stop, because O'Farrell did not personally witness any erratic operation of the defendant's vehicle, and the defendant did not commit a motor vehicle infraction. We do not agree.

Having set forth the court's findings, our standard of review, and the defendant's arguments, we turn to an examination of the applicable principles of substantive law. "Under the fourth amendment to the United States constitution . . . a police officer is permitted in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes if the officer believes, based on a reasonable and articulable suspicion that the individual is engaged in criminal activity, even if there is no probable cause to make an arrest." (Internal quotation marks omitted.) *State* v. *Lipscomb*, 258 Conn. 68, 75, 779 A.2d 88 (2001); see also *Terry* v. *Ohio*, supra, 392 U.S. 21. "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion." (Internal quotation marks omitted.) *State* v. *Wilkins*, 240 Conn. 489, 496, 692 A.2d 1233 (1997). Whether a reasonable and articulable suspicion exists depends on the totality of the circumstances. *State* v. *Nash*, 278 Conn. 620, 641, 899 A.2d 1 (2006).

"[I]n justifying [a] particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . . In determining whether a detention is justified in a given case, a court must consider if, relying on the whole picture, the detaining officers had a particularized and objective basis for suspecting the particular person stopped of criminal activity. When reviewing the legality of a stop, a court must examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . A recognized function of a constitutionally permissible stop is to maintain the status quo for a brief period of time to enable the police

to investigate a suspected crime. . . .

"[E]ffective crime prevention and detection . . . [underlie] the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. . . . Therefore, [a]n investigative stop can be appropriate even where the police have not observed a violation because a reasonable and articulable suspicion can arise from conduct that alone is not criminal. . . . In evaluating the validity of such a stop, courts must consider whether, in light of the totality of the circumstances, the police officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." (Citations omitted; internal quotation marks omitted.) *State* v. *Lipscomb*, supra, 258 Conn. 75–76.

"In cases in which a police stop is based on an informant's tip, corroboration and reliability are important factors in the totality of the circumstances analysis. [I]nformants do not all fall into neat categories of known or anonymous. Instead, it is useful to think of known reliability and corroboration as a sliding scale. Where the informant is known from past practice to be reliable . . . no corroboration will be required to support reasonable suspicion. Where the informant is completely anonymous . . . a significant amount of corroboration will be required. However, when the informant is only partially known (i.e., [informant's] identity and reliability are not verified, but neither is [informant] completely anonymous), a lesser degree of corroboration may be sufficient to establish reasonable suspicion." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Torelli*, supra, 103 Conn. App. 653. "When an informant provides sufficient information so that he may be located and held accountable for providing false information, the officer is justified in assuming the caller is being truthful in so identifying himself." (Internal quotation marks omitted.) *State* v. *Bolanos*, 58 Conn. App. 365, 369, 753 A.2d 943 (2000).

The defendant specifically claims that the court erred in concluding that O'Farrell had formulated the requisite level of suspicion to stop the defendant's vehicle in accordance with the constitution because O'Farrell "did not have any specific knowledge about the identities of the callers or their specific observations [of the defendant]" as reported to the 911 operator, and he did not personally observe the defendant drive erratically or commit a motor vehicle infraction, which would have corroborated the tips from Hettler and Sterling. We are not persuaded.

The defendant argues that O'Farrell's "[reliance] on the callers to formulate his basis for stopping the defendant's vehicle" is insufficient to establish a reasonable and articulable suspicion because he "only knew that

there had been two calls about this vehicle; he neither knew anything about the driver nor did he know what specific conduct that had been observed." We disagree.

The evidentiary record supports the court's legal conclusion that O'Farrell had a reasonable and articulable suspicion to stop the defendant. At trial, O'Farrell testified that he did not speak to the callers and he did not know specifically what information Hettler and Sterling reported to the police dispatchers. O'Farrell, however, was aware of the "be on the lookout" alert issued by the Bethel Police Department regarding the defendant's vehicle. Our Supreme Court has noted that "[t]he collective knowledge of the [law enforcement] organization as a whole can be imputed to an individual officer when he is requested or authorized by a superior or associates to make an arrest." (Internal quotation marks omitted.) *State* v. *Watson*, 165 Conn. 577, 586, 345 A.2d 532 (1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d 311 (1974). In the present case, the police received two calls from identified informants, made approximately forty-five minutes apart, reporting the same information regarding the make, model, color, direction, and license plate number of the defendant's car. The police received the second 911 call from Sterling just four to five minutes before O'Farrell stopped the defendant's vehicle. Before pulling the vehicle over, O'Farrell called the police dispatcher and confirmed that the license plate number matched that provided in the alert. The court further found that the vehicle's location at 10 p.m. in Bethel was consistent with the distance that could be traveled from the vehicle's alleged location as reported in Hettler's 911 call. The collective knowledge of law enforcement can be imputed to O'Farrell because he contacted the police dispatcher to confirm that the vehicle was indeed the subject of the earlier "be on the lookout" alert and he was authorized to make an investigatory stop. See id. We, thus, conclude that, considering the specific information available to O'Farrell at the time of the stop and the reasonable inferences derived from that information, O'Farrell had a particularized and objective basis for suspecting the defendant was driving under the influence of intoxicating liquor. See *State* v. *Lipscomb*, supra, 258 Conn. 76.

We are not persuaded by the defendant's contention that the record does not support the court's conclusion that the information alleged by Hettler and Sterling was sufficiently corroborated so as to provide a particularized and objective basis for O'Farrell to stop his vehicle because the present case is distinguishable from *State* v. *Burns*, 140 Conn. App. 347, 59 A.3d 819, cert. denied, 308 Conn. 918, 62 A.3d 1132 (2013). In *Burns*, this court held that a police officer, who was aware of three reports alleging that the operator of a motor vehicle had been driving under the influence, had a reasonable and articulable suspicion to effectuate a motor vehicle stop. Id., 359. The defendant claims that the present

case is factually distinguishable because there were only two reported calls from concerned motorists, made approximately forty-five minutes apart, and O'Farrell did not independently corroborate the allegations of erratic driving. We do not agree.

In denying the defendant's motion to suppress, the court reasonably found that O'Farrell had corroborated the reports of erratic operation by personally observing the defendant's prolonged and unjustified stop at the traffic sign. O'Farrell testified that, given the fact that no other cars were approaching the area, the prolonged stop at the traffic sign was unusual and, in his experience, indicative of intoxication. The court specifically found that O'Farrell confirmed the information alleged in the tips from "hi[m] personal[ly] . . . seeing the defendant stopped for no reason at all for a prolonged period of time at the stop sign." The court agreed that the defendant's behavior was unusual when "there were no vehicles crossing through that [intersection] . . . ." When viewed in its totality, the information provided to O'Farrell by the police dispatcher was sufficiently corroborated to give a reasonable police officer the requisite level of suspicion to justify a *Terry* stop on the basis of driving under the influence of intoxicating liquor.

Our review of the record indicates that the court properly concluded that O'Farrell had a reasonable basis for the investigative stop. Therefore, the introduction of the defendant's statements and the other evidence at trial obtained during the stop did not result from a violation of the fourth amendment to the United States constitution. At the time he pulled the defendant over, O'Farrell possessed a reasonable and articulable suspicion that the defendant was operating a motor vehicle while under the influence of intoxicating liquor. See *Terry* v. *Ohio*, supra, 392 U.S. 21. Accordingly, we conclude that the court properly denied the defendant's motion to suppress evidence that the police obtained during the stop of his automobile.

II

The defendant also claims that his right of confrontation under the federal constitution was violated when the court denied his motion to suppress the Draeger machine reports. The defendant specifically argues that four witnesses were required to testify in order to satisfy the confrontation clause: (1) the breath test operator; (2) the calibration analyst; (3) the quality assurance specialist; and (4) the ethanol breath standard analyst. At trial, the state presented the testimony of Christos, the breath test operator, and Powers, the quality assurance specialist.[7] The defendant argues, however, that his conviction should be reversed due to the state's failure to call additional witnesses who might have had information relevant to the reliability of the Draeger machine. At oral argument before this court, the state

argued that *State* v. *Buckland* is legally and factually on all fours with the present case, and that it is dispositive of the defendant's confrontation clause claim. See *State* v. *Buckland*, 313 Conn. 205, 216, 96 A.3d 1163 (2014) (holding opportunity to cross-examine breath test operator and expert to explain test results, together with uncontested admission of document certifying machine as an evidential breath test instrument, satisfied defendant's right of confrontation). We agree with the state.

"The right to confrontation is fundamental to a fair trial under both the federal and state constitutions. . . . It is expressly protected by the sixth and fourteenth amendments to the United States constitution . . . .

"The primary interest secured by the confrontation clause of the sixth amendment is the right to cross-examination. . . . The confrontation right, however, is not absolute and is subject to reasonable limitation. . . . [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination . . . or interrogation that is repetitive or only marginally relevant." (Citations omitted; internal quotation marks omitted.) *State* v. *Kimber*, 48 Conn. App. 234, 248, 709 A.2d 570, cert. denied, 245 Conn. 902, 719 A.2d 1164 (1998).

Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. "A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct . . . ." (Internal quotation marks omitted.) *State* v. *Stenner*, 281 Conn. 742, 761, 917 A.2d 28, cert. denied, 552 U.S. 883, 128 S. Ct. 290, 169 L. Ed. 2d 139 (2007). "The court's ruling that the admission of [a breath test report] did not violate the constitutional mandates of *Crawford* [v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)] . . . raises a question of law over which we exercise plenary review. [I]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Randolph*, 284 Conn. 328, 377, 933 A.2d 1158 (2007).

Our Supreme Court recently decided the precise issue raised by the defendant in this appeal. In *Buckland*, the defendant claimed that the trial court improperly denied his motion to suppress breath test reports, violating his right to confrontation under the sixth amendment to the United States constitution. *State* v. *Buckland*, supra, 313 Conn. 208. As with the defendant in the present case, the defendant in *Buckland* claimed that the testimony of the breath test operator, the calibration analyst,

the quality assurance specialist, and the ethanol breath standard analyst was required to satisfy his rights under the confrontation clause, as defined in *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). *State* v. *Buckland*, supra, 208, 214. Our Supreme Court rejected the defendant's claim, ruling that the presence, at trial, of the person who performed the breath test and the expert who explained the results of that test, together with the uncontested admission of a document certifying the machine as an evidential breath test instrument, satisfied the requirements of *Melendez-Diaz* and *Bullcoming* v. *New Mexico*,      U.S.     , 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011). *State* v. *Buckland*, supra, 216. Although this holding was dispositive, the *Buckland* court alternatively held that raw data generated from a machine, such as a breath test machine, does not constitute testimonial evidence for the purposes of the confrontation clause and, therefore, the admission of such data into evidence is not subject to the restrictions imposed by *Melendez-Diaz*. Id., 214–15.

On appeal, the defendant claims that the record in the present case is "strikingly different" from the record in *Buckland* for three reasons. First, the defendant argues that, in addition to two exhibits containing the raw data from the Draeger machine, which were presented in *Buckland* and found to be not testimonial in nature,[8] the record in the present case contains additional evidence which is testimonial in nature; specifically, an image of the calibration solution bottle, service records for the Draeger machine, and a certificate of accuracy from Draeger Safety Diagnostics, Inc., the manufacturer. Consequently, the defendant argues that the state was required to present the calibration analyst, the quality assurance specialist, and the ethanol breath standard analyst, in addition to Powers and Christos, for cross-examination by the defendant. Second, the defendant points to testimony in the present case, not elicited from Powers when testifying as the state's expert witness in *Buckland*, indicating that he is not certified to operate the Draeger machine. The defendant argues that the confrontation clause analysis is consequently affected by this additional testimony, because the "testimony [of Powers] was not sufficient" to satisfy the defendant's right to confront "MM," the individual whose signature appears on the certificate of accuracy. Lastly, the defendant argues that his right to confront the individuals who altered the Draeger machine report to omit four calibrations was violated. We are not persuaded.

We conclude that the confrontation clause claim raised in the present case is identical to the one raised in *Buckland*. The evidence presented by the state in the present case to ensure that the admission of the Draeger machine reports, which appears to be almost identical to the evidence presented in *Buckland*, satis-

fied the requirements of *Melendez-Diaz*. In the present case, the state called as witnesses Christos, who performed the breath tests, and Powers, an expert, who explained the results of the breath tests. The defendant effectively cross-examined Christos and Powers regarding their knowledge of the Draeger machine and its operation. Powers was also called by the state as an expert witness in *Buckland*. *State* v. *Buckland*, supra, 210–11.

Additionally, the state presented three documents concerning the certification, maintenance, and accuracy of the breath test machine used in this case. One of these documents, which was a full exhibit, indicated that the Draeger machine "was evaluated and certified for use as an evidential [b]reath [a]lcohol [t]est [i]nstrument on August 18, 2010 . . . ." The state also introduced as a full exhibit the printed report from the Draeger machine that pertained to the two samples collected from the defendant at the Redding Police Department.

We, therefore, agree with the state that the defendant was not denied his constitutional right of confrontation under the federal constitution by the admission of the Draeger machine reports, and that *Buckland* is dispositive. Thus, we conclude that the court properly denied the defendant's motion to suppress the breath test evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] We note that § 14-227a has been amended by our legislature several times since the events underlying the present appeal. See, e.g., Public Acts 2013, No. 13-271, § 51. These amendments are not relevant to this appeal and, for purposes of clarity, we refer to the current revision of the statute.

[2] The defendant also argues in his brief that the trial court improperly denied his motions to suppress in violation of article first, §§ 7, 8, and 9, of the Connecticut constitution. With respect to his argument under the state constitution, the defendant simply notes that "article first, §§ 7 and 9, of the Connecticut constitution afford greater protection to citizens than does the federal constitution in the determination of what constitutes a seizure." (Internal quotation marks omitted.) In *State* v. *Donahue*, 251 Conn. 636, 645, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000), our Supreme Court explained that, under the state constitution: "Police have the right to stop for investigation short of arrest where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot. . . . [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Internal quotation marks omitted.) See also *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992). The defendant contends that the circumstances of the present case "do not reach the required showing that is necessary to establish a reasonable and articulable suspicion as is required by . . . the heightened level of protection required by article [first], §§ 7 and 9, of the Connecticut constitution." (Emphasis added.) With respect to his claim regarding the breath tests, the defendant merely notes that, at trial, he "sought suppression of the breath test evidence in the absence of testimony of those individuals that affect the test reports pursuant to . . . [article first, § 8, of the Connecticut constitution] . . . ."

Although the defendant refers to violations of his rights under article first, §§ 7, 8, and 9, of the Connecticut constitution, he has failed to provide an independent analysis of state constitutional issues. See *State* v. *Eady*, 249 Conn. 431, 435 n.6, 733 A.2d 112, cert. denied, 528 U.S. 1030, 120 S. Ct. 551, 145 L. Ed. 2d 428 (1999); see also *State* v. *Buckland*, 313 Conn. 205, 221 n.6

96 A.3d 1163 (2014). We, accordingly, do not consider the defendant's state constitutional claims.

[3] Specifically, Christos administered the horizontal gaze nystagmus test, the walk and turn test, and the one leg stand test.

[4] At the time of the defendant's arrest, the Bethel Police Department's breath test machine was out for service. The Bethel Police Department, accordingly, had an agreement with the Redding Police Department to use their machine on February 11, 2011.

[5] General Statutes § 14-227a (a) (2) provides in relevant part: "For the purposes of this section, 'elevated blood alcohol content' means a ratio of alcohol in the blood of such person that is eight-hundredths of one per cent or more of alcohol, by weight . . . ." This ratio corresponds to a BAC of 0.08.

[6] At oral argument before this court, the defendant represented that he was challenging certain findings of fact. Our thorough review of the defendant's brief reveals that, instead, the defendant challenges only the court's legal conclusion that O'Farrell had a reasonable and articulable suspicion to effectuate a stop of the defendant's vehicle based on its factual findings. See *State* v. *Torelli*, supra, 103 Conn. App. 650.

[7] The defendant does not concede that Powers satisfies the confrontation requirement with respect to the quality assurance specialist, and argues: "Only the analyst who was maintaining the machine around the time of the test will be able to testify as to what maintenance was performed and how that maintenance was performed. Substitute testimony regarding the care and maintenance of the machine is not acceptable."

[8] The record in *Buckland*, like the present case, included as exhibits the breath test results and a letter from the state toxicology laboratory certifying the Draeger machine as an "evidential [b]reath [a]lcohol [t]est [i]nstrument." See *State* v. *Buckland*, supra, 313 Conn. 210.